STEWART, J.
 

 11 Dana Kay Slaughter (“Dana”) appeals a judgment modifying joint custody of her daughter, A.S., by naming the father, Jody Alan Slaughter (“Jody”), the primary domiciliary parent and by granting Dana visitation. Finding no manifest error in the trial court’s judgment, we affirm.
 

 FACTS
 

 When Jody and Dana married, Dana was pregnant with her first child, S.S. The parties agree that Jody is not the biological father of S.S. The child who is at the center of this custody dispute, A.S., is the biological child of both parties and is Dana’s second child. Dana also had a third child after the marriage to Jody ended.
 

 On May 17, 2002, Dana filed a petition for divorce requesting joint custody of S.S. and A.S. Based on stipulations, a judgment of joint custody was rendered naming Dana as the primary domiciliary parent and granting Jody granted reasonable visitation rights. The judgment ordered Jody to pay child support for both children. He had agreed to pay support for S.S. as long as he had the same visitation rights as to both children. The parties’ divorce became final on January 16, 2003.
 

 Alleging that Dana was planning to move with the children to Tennessee, that she was living with a man to whom she was not married, that the man was violent, that Dana had used marijuana with the man in the children’s presence, and that Dana had allowed the man to give marijuana to the children, Jody filed a rule to change custody in May 2004. He requested either sole custody of the children or joint custody with him as the primary domiciliary parent. In the event Dana was allowed to move with the |achildren to Tennessee, he asked that his child support
 
 *790
 
 obligation be reduced so that he no longer paid support for S.S.
 

 In her answer and reconventional demand, Dana generally denied Jody’s allegations and stated that she was no longer planning to move to Tennessee. She asked for termination of Jody’s visitation rights and support obligation for S.S. Alleging that Jody is habitually late with child support payments, she requested a wage assignment order. She asserted that Jody had little interest in the children and exercised his visitation rights sporadically, often cancelling at the last minute or without notification. She further asserted that Jody’s wife, Denise, disciplined the children in an improper manner, cursed in their presence, and threatened to beat her up.
 

 Again the parties stipulated to an agreement in October 2004, terminating Jody’s custodial rights and support obligations as to S.S., while maintaining the previous custody order and support for A.S. with additional visitation for Jody. A wage assignment order was issued for the child support. Shortly after this stipulated judgment, Jody did not see A.S. for almost two years. The parties dispute the reasons for the lack of contact.
 

 On January 7, 2008, Jody filed a petition seeking sole custody of A.S., age seven, with supervised visitation for Dana. Jody complained that Dana had not allowed him visitation as provided by their joint custody plan. Asserting that A.S. was subject to “unthinkable neglect and abuse at the hands of her mother,” he alleged that Dana had left A.S. alone with a younger sibling while she worked and went hunting with her boyfriend; that the boyfriend, Larry Anderson, Jr., (“Anderson”) lived with Dana and the | ochildren; that Anderson had “committed violence” against A.S.; and that A.S. had been exposed to “sexual actions” between Dana and different men.
 
 [1]
 

 At a hearing on January 17, 2008, Jody obtained temporary custody of A.S. based on the testimony of Dr. E.H. Baker, an expert in family and child psychology who had interviewed A.S. on two occasions. Dana was restricted to supervised visitation and prohibited against having overnight guests of the opposite sex in A.S.’s presence. The trial court ordered A.S., the parties, Anderson, and Jody’s wife (Denise Slaughter) to submit to psychological evaluations by Dr. Sally Thigpen. The parties agreed that Dr. Baker’s testimony would be made part of the record at the custody trial.
 

 After the custody trial in March 2008, the trial court rendered a judgment modifying the prior joint custody decrees to name Jody as the primary domiciliary parent and to grant Dana visitation. The judgment prohibited overnight guests of the opposite sex, the making of negative comments about the parents, and the use of drugs or alcohol in the child’s presence. Jody, Denise, Dana, and Anderson were ordered to attend parenting classes. The parties were also ordered to have A.S. seen by a therapist. The trial court was persuaded by the reports that A.S. had seen Dana engaged in sexual encounters, the claim that Dana had not allowed Jody to visit A.S., and the fact that she had been living with Anderson to whom she was not married.
 

 | ¿DISCUSSION
 

 The best interest of the child is the paramount consideration in child custody matters. La. C.C. art. 131;
 
 Evans v. Lungrin,
 
 1997-0541 (La.02/06/98), 708
 
 *791
 
 So.2d 731;
 
 Craig v. Craig,
 
 42,363 (La.App. 2d Cir.5/9/07), 956 So.2d 819,
 
 writ denied,
 
 2007-1349 (La.7/27/07), 960 So.2d 64. When custody has previously been determined by stipulated decrees, as in this matter, the party seeking modification must prove that there has been a material change in circumstances and that the proposed modification is in the best interest of the child.
 
 Id.
 

 The court shall consider all relevant factors in determining the best interest of the child. La. C.C. art. 134. The court is not required to make a mechanical evaluation of the nonexclusive factors listed in La. C.C. art. 134. Rather, it must decide each case on its own facts and must weigh and balance the relevant factors in light of the evidence presented.
 
 Cooper v. Cooper,
 
 43,244 (La.App. 2d Cir.3/12/08), 978 So.2d 1156.
 

 The trial court has vast discretion in deciding matters of child custody and visitation.
 
 Gaskin v. Henry,
 
 36,714 (La.App. 2d Cir.10/23/02), 830 So.2d 471. This discretion is based on the trial court’s opportunity to better evaluate the credibility of the witnesses.
 
 McCready v. McCready,
 
 41,026 (La.App. 2d Cir.3/8/06), 924 So.2d 471. Therefore, its determination will not be disturbed absent a clear showing of an abuse of discretion.
 
 Cooper, supra.
 
 As long as the trial court’s factual findings are reasonable in light of the record when reviewed in its entirety, the appellate court may not reverse even though convinced it would have weighed the evidence differently if 15acting as the trier of fact.
 
 Id.; Flanagan v. Flanagan,
 
 36,852 (La.App. 2d Cir.03/05/03), 839 So.2d 1070.
 

 Seeking reversal of the trial court’s judgment, Dana argues that Jody failed to prove either a change in circumstances or that the modification was in the best interest of their child. She contends that application of the factors under La. C.C. art. 134 weigh in her favor and that the trial court’s judgment was a punishment for her bad decisions rather than a determination of A.S.’s best interest. Dana also argues that the trial court should have given greater weight to the recommendations of Dr. Thigpen, who evaluated A.S., the parties, and their partners.
 

 Most of Jody’s allegations are supported by information obtained by Dr. Baker from A.S. during two interviews. Jody and Denise arranged for A.S. to see Dr. Baker after Denise saw the child playing in a sexually suggestive manner with unclothed dolls. According to Dr. Baker, A.S. said that her mother and Anderson fought a lot and that he was mean and drank beer every night. She reported an incident when he grabbed her by the shirt and sent her to her room; this is the violent incident complained of by Jody in his petition. A.S. also told Dr. Baker that her mother left her and her siblings alone at times. She reported that she had seen her mother with three different men in sexual encounters. She told Dr. Baker that they were naked. He did not ask for details. A.S. described the men, one of whom was Anderson. Dr. Baker testified that A.S.’s stories were consistent in both interviews. Though she was not a good time reporter due to her age, | fihe felt that A.S. was being truthful. The language she used was age-appropriate and disjointed, thus suggesting that she had not been coached.
 

 A behavior assessment scale indicated that A.S. was experiencing anxiety, worry, and nervousness. Dr. Baker believed this suggested that her living environment was causing her some concern. He also reported that A.S.’s overall score on a child sexual behavior inventory suggested that she had been exposed to things that she should not have been. He explained that seeing adults in sexual acts can be dis
 
 *792
 
 tressing to young children and can contribute to anxiety, stress, and a breakdown in trust. He noted that A.S. did not like what she had seen and had an emotional response to it.
 

 Dr. Sally Thigpen’s initial report to the court on February 25, 2008, made three recommendations. First, she recommended leaving temporary custody with Jody pending further investigation into Dana’s ability to parent safely. If it was to be determined that Dana engaged in inappropriate behavior with men in A.S.’s presence, then Dr. Thigpen recommended that supervised visitation remain in place until Dana completed remediation of her parenting skills. Second, she recommended that both Jody and Dana attend psychoeducation on parenting in the context of a divorce. She noted that Jody had not demonstrated that he is a loving father and that Dana had not demonstrated that she is able to parent rather than be a buddy. Third, she recommended that A.S. see a therapist to address issues of attachment disorders and that her parents consult with her school to address educational concerns. Dr. Thigpen believed A.S. lacked a positive attachment to her parents.
 

 |7In a second report on March 10, 2008, Dr. Thigpen again recommended that A.S. attend therapy and that the parties, Denise, and Anderson attend parenting classes. However, she concluded that there was no material change in circumstances that would require modification of the parties’ initial joint custody arrangement. Dr. Thigpen explained that at the time of the first report she was waiting on the results of an investigation by the Office of Community Services (OCS) and did not want to change the temporary order until there was more information on whether Dana’s parenting was harming A.S. When OCS determined that further investigation or action was not warranted, Dr. Thigpen met with A.S. again and concluded that her stories contained enough inconsistencies that they could not provide a basis for a change in custody. For instance, Dr. Thigpen related that A.S. told her that she had seen Dana with four men, whereas she told Dr. Baker about three men. Dr. Thigpen also concluded that these incidents had occurred at night and not during the day as she believed was indicated by Dr. Baker. Dr. Thigpen suggested that Dana having been with men at night when the children should have been sleeping might be poor parenting, but it is not particularly harmful. Moreover, she suggested that concern over children seeing their parents engaged in sex is exaggerated and that the parent’s overreaction may be worse for the child.
 

 Dr. Thigpen also expressed great concern that Jody had not seen A.S. for almost two years and that he had given up his parental responsibilities to S.S. for financial considerations. She found the results of his evaluation to be invalid due to his refusal to admit to any interpersonal conflict, ^particularly since he was embroiled in a custody dispute, and his unusual number of answers indicating that he either always did the right thing or never did anything wrong. Overall, she did not find either Jody or Dana to be ideal parents, and her reports indicate that both have credibility issues.
 

 Though Dana argues that the trial court erred in not giving greater weight to Dr. Thigpen’s recommendations, the record shows that the trial court was unpersuaded by Dr. Thigpen’s reasons for the change in recommendations between the two reports. The fact that OCS did not pursue an investigation indicates that it did not find the circumstances to warrant the drastic measure of its involvement, but it does not mean that a change in custody is not war
 
 *793
 
 ranted if the appropriate standards are satisfied. The trial court believed that Dana had been with men at times when her children were present and that this was poor parenting that was harmful to A.S. Dr. Baker expressed the opinion that Dana’s actions were harmful to the child. Considering the conflict in the expert testimony, we cannot say that the court’s conclusion on this point is wrong.
 

 Though Dana denied the sexual incidents reported by A.S., she did admit to sleeping with Anderson when the children were present. The trial court concluded that Dana’s decision to live with Anderson to whom she was not married was demonstrative of her poor parental judgment. The fact that Dana had been living with Anderson and the reports by A.S. of seeing her mother with Anderson and other men can be considered material changes in circumstances that would support a change in custody if found to be in the child’s best interest.
 

 [(¡Moreover, the trial court concluded that Dana had not allowed Jody to see A.S. for almost two years. The court also noted that Jody’s failure to pay child support was inexcusable, and we agree. Both parties gave differing accounts as to why no visitation occurred between Jody and A.S. during the two years following the 2004 stipulated judgment'. Jody claimed that Dana did not allow him to see A.S. once he gave up custodial rights to S.S. Dana claimed that Jody stopped visitation and would not take her calls. There was testimony that an argument occurred between Dana and Denise in October 2004, which led to Dana filing a police report and Denise being issued a citation for simple battery. She was not prosecuted for the charge. Though Jody claimed he did not know where Dana was living and could not contact her during the time he did not visit A.S., his mother, Sybil Arnold, visited the child and knew where she lived. However, Arnold testified that Dana did not want Jody around her daughter S.S., and she told the trial court that she felt if she let Jody see A.S., then Dana would not let her continue to see the children. In light of the parties’ conflicting stories about why Jody did not have contact with A.S. for almost two years, we cannot say the trial court was manifestly erroneous in concluding that Dana did not allow Jody to exercise visitation.
 

 Having reviewed the entirety of the record, we cannot agree with Dana’s contentions that the trial court’s ruling was a punishment for her bad decisions rather than a determination of the child’s best interest or that the factors of La. C.C. art. 134 do not support the decision. When A.S. was interviewed by Dr. Baker prior to the trial court awarding temporary custody |into Jody, he noted that A.S. exhibited problems with anxiety, nervousness, and worrying. One of A.S.’s teachers, Paula Jimmerson, testified that she noticed a change in A.S.’s behavior around Thanksgiving 2007, when she became more aggressive, seemed angry and upset all the time, and had trouble getting along with her peers. These behaviors would have begun while A.S. was in Dana’s care prior to the rendering of the temporary custody order at the January 2008 hearing.
 

 Moreover, while some of the Article 134 factors might weigh in favor of Dana, not all do so. The recommendation by Dr. Thigpen for A.S. to attend therapy to address attachment disorders and for Dana and Jody to undergo intensive parenting classes suggests that both parties have deficiencies that impair their abilities to appropriately rear A.S. Though the child lived with Dana for the first six years of her life, she has been in the primary care of Jody and his wife since the temporary custody order of January 2008 and the subsequent judgment naming him primary domiciliary parent. A year has now
 
 *794
 
 elapsed, and further upheaval by yet another change in custody would not be warranted unless we were to find that the trial court had abused its vast discretion in its custody determination. We find no such abuse. As noted by the trial court, Dana’s situation with Anderson was subject to change, whereas Jody was remarried and has a stable home environment. The trial court’s judgment also calls into question Dana’s moral fitness in light of the claims that A.S. had seen her with various men and the fact that she had been living with Anderson. Dr. Baker’s testimony indicated that Dana’s actions had affected A.S.’s welfare. Lastly, while in |1TPana’s care, A.S. did not see her father for almost two years. The trial court attributed this to Dana’s fault, as previously discussed. Thus, there are concerns about Dana’s willingness and ability to foster a close and continuing relationship between A.S. and her father.
 

 While we may have weighed the evidence differently if sitting as a trier of fact, we cannot conclude on this record that the trial court was manifestly erroneous in its determination. Its findings and judgment are reasonable in light of the record viewed in its entirety. The trial court had the opportunity to hear the witnesses, observe their demeanor, and assess their credibility. The record supports the conclusion that there were material changes in circumstances and that the change in custody was in the child’s best interest.
 

 CONCLUSION
 

 For the reasons explained, we affirm the trial court’s judgment. Costs are assessed to the appellant.
 

 AFFIRMED.
 

 [1]
 

 . It does not appear from the record that Anderson is the same man complained of by Jody in the May 2004 petition to change custody.