WILLIAMS, J.
[,In this child custody dispute, the mother, Shareese L. Finley, appeals a trial court judgment awarding primary domiciliary custody of the minor child to the father, Richard Demarcus Wilson, Sr. For the following reasons, we affirm.
FACTS
Richard Demarcus Wilson, Sr. (“Richard”) and Shareese L. Finley (“Shareese”) are the parents of the minor child, “R.J.,” who was born on February 24, 2007. At the time of R.J.’s birth, Richard and Shar-eese were sophomores in high school. Richard’s mother, Judy Wilson (“Mrs. Wilson”) took care of R.J. while Richard and Shareese continued with school and school-related extracurricular activities. Richard and his parents testified that by the end of 2007, Shareese allowed R.J. to live with them “due to the unstable situation with [Shareesej’s family and her living arrangements.” [1] However, Shareese denied allowing R.J. to live with the Wilson family. She testified that R.J. lived with both her and Richard, alternating weeks between the Wilson home and her grandmother’s home.
Richard and Shareese graduated from high school in 2009. Both were offered scholarships to attend college — Richard was offered athletic scholarships from various universities; Shareese received a TOPS scholarship which would pay her tuition to a college or university in the state of Louisiana. Richard decided to attend Southern University in Baton Rouge, while Shareese chose to attend Grambling State University in 12Grambling. The parties decided that R.J. would live with Richard’s parents while Richard and Shareese attended college. Pursuant to the oral agreement, Richard’s parents would take care of R.J. from Sunday evenings until Friday evening; Shareese would care for him from Friday evening until Sunday evening, during holiday breaks and during the summer months.
During the trial, the evidence was virtually undisputed that Richard played college football and rarely came home on weekends when he was in college in Baton Rouge. However, the testimony varied with regard to how often Shareese came to get R.J. from the Wilsons’ home on weekends.[2]
*284 Nevertheless, the agreement remained in place until 2011. According to the testimony presented at trial, Mrs. Wilson called Richard and Shareese and told them they needed to formulate a plan to assume responsibility for caring for R.J. because she and her husband were “getting tired.” At that point, Shareese and her aunt, La-Chandon Finley, met with Mrs. Wilson to address the issue. Initially, Shareese suggested having R.J. come to Ruston to live with her in her off-campus apartment. However, due to her nursing school schedule, the plan was not feasible because on at least one day of the |sweek, she did not have anyone to care for R.J.[3] According to Shareese, her “Plan B” was to have R.J. remain in Monroe and live with her aunt.
Meanwhile, Richard considered dropping out of college to return home to care for R.J. After contemplating the alternatives, Mrs. Wilson decided that it was best for R.J. to remain in her home; Richard and Shareese agreed. At some point, Richard decided to return to Monroe to “take care of [his] responsibility as a man” and assume the care of R.J. For the 2011-2012 school year, Richard transferred to Grambling State University, resided at home with his parents and R.J., and commuted to Grambling for classes. Subsequently, he was offered a scholarship to play football at Grambling and moved into an apartment in Ruston. Richard then sustained a football injury and moved back to Monroe to live with his parents. At that time, according to Richard and his parents, he assumed the day-to-day care of R.J., doing tasks such as helping R.J. get dressed for school, helping him with homework in the evenings, volunteering for certain activities at the school and coaching some of R.J.’s sporting activities. Richard continued with his studies at Grambling, commuting from Monroe to Grambling for classes.
On March 27, 2013, Richard filed a petition seeking primary domiciliary custody of R.J. Thereafter, the trial court entered an interim custody order, awarding domiciliary custody to Richard; Shareese was granted “liberal visitation.” Following a conference, the hearing officer recommended that the parties be awarded joint custody, with Richard ^designated as the domiciliary parent. Shareese objected to the hearing officer’s report, and a trial to determine the custody of R.J. was held.
During the hearing, the evidence established the following: R.J. was a student at Robinson Elementary School; he was well-behaved; he made good grades; Shareese was employed full-time at Glenwood Regional Medical Center;[4] Shareese had her own apartment in Ruston and received government housing assistance; Richard was a full-time college student; he resided with R.J. at his parents’ home; he was not employed.
R.J.’s teachers from pre-kindergarten and kindergarten testified at trial. R.J.’s pre-kindergarten teacher testified that he had not met Shareese. He stated that Richard came to the school to check on R.J.’s progress, and Richard and his par *285 ents attended parent/teacher conferences. R.J.’s kindergarten teacher testified that Richard participated in R.J.’s education and he came to the school for parent lunches and field day activities. She further testified that Shareese picked up R.J. from school “maybe two times” and attended his kindergarten graduation. However, the teacher testified that she did not recall discussing R.J.’s progress in school with Shareese.
The testimony at trial varied with regard to who provided for R.J. financially. Shareese testified that she purchased “everything” R.J. needed, including “all” of his school clothes and supplies, Christmas gifts and [,/¡birthday presents. She also stated that she paid for all of his birthday parties, while Richard never purchased anything for R.J. She and her witnesses testified that she spent as much as $500 per year on school clothes and at least $700 per year on Christmas gifts.[5]
Conversely, Richard and his parents testified that Shareese never provided any financial support for R.J.’s care. Richard and his mother testified that Shareese received benefits through the Supplemental Nutrition Assistance Program (“SNAP”), in part, by claiming R.J. as a dependent on her application.[6] They also testified that the only contribution Shareese made for RJ.’s care was that she allowed Mrs. Wilson to use her SNAP card to purchase food for R.J. in the amount of $65 per month. According to the Wilsons, Richard purchased R.J.’s school clothes and supplies and paid his school fees. They admitted that Richard and Shareese both purchased Christmas gifts for R.J.[7]
It appears that the relationship between the parties became volatile and deteriorated when, in January 2013, Mrs. Wilson informed Shareese that she would be claiming R.J. as a dependent on her federal and state income tax returns because he resided with her.[8] Prior to that year, Shar-eese |fihad been claiming R.J. as a dependent and receiving both the child tax credit and earned income credit, although he primarily resided with the Wilsons.
Following a three-day hearing, the trial court awarded the joint custody of R.J. to the parties, with Richard being designated the primary domiciliary parent. The court also ordered that the recommendations of the hearing officer be maintained.[9]
Shareese appeals.
*286 DISCUSSION
Shareese contends the trial court erred in awarding primary domiciliary custody to Richard. She argues that the court erred in finding that Richard is in a better position to provide food, clothing and medical care to R.J. She points out that, at the time of the hearing, Richard was unemployed, had a very limited employment history and lived with his parents, who had filed Chapter 13 bankruptcy proceedings. Shareese further | 7argues that at the time of the trial, she had a full-time job and her own apartment.
It is well settled in our statutory and jurisprudential law that the .paramount consideration in any determination of child custody is the best interest of the child. LSA-C.C. art. 131; Evans v. Lung-rin, 97-0541 (La.2/6/98), 708 So.2d 731; Semmes v. Semmes, 45,006 (La.App.2d Cir. 12/16/09), 27 So.3d 1024; Shivers v. Shivers, 44,596 (La.App.2d Cir.7/1/09), 16 So.3d 500. The court is to consider all relevant factors in determining the best interest of the child. LSA-C.C. art. 134.[10]
| ¡/The trial court is not bound to make a mechanical evaluation of all of the statutory factors listed in LSA-C.C. art. 134, but should decide each case on its own facts in light of those factors. Semmes, supra; Robert v. Robert, 44,528 (La. App.2d Cir.8/19/09), 17 So.3d 1050, writ denied, 2009-2036 (La.10/7/09), 19 So.3d 1; Bergeron v. Bergeron, 44,210 (La.App.2d Cir.3/18/09), 6 So.3d 948. These factors are not exclusive, but are provided as a guide to the court, and the relative weight given to each factor is left to the discretion of the trial court. Id.
LSA-R.S. 9:335(A)(2)(b) provides that, to the extent feasible and in the best interest of the child, physical custody of the child should be shared equally. However, the law is clear: substantial time, rather than strict equality of time, is mandated by the legislative scheme providing for joint custody of children. Semmes, *287 supra; Stephenson v. Stephenson, 87,323 (La.App.2d Cir.5/14/03), 847 So.2d 175.
The trial court has vast discretion in deciding matters of child custody and visitation. Semmes, supra; Slaughter v. Slaughter, 44,056 (La.App.2d Cir.12/30/08), 1 So.3d 788; Gaskin v. Henry, 36,714 (La.App.2d Cir.10/23/02), 830 So.2d 471. Therefore, the trial court’s determination will not be disturbed on appeal, absent a clear showing of an abuse of discretion. | ^Bergeron v. Bergeron, 492 So.2d 1193 (La.1986); Semmes, supra; Slaughter, supra. As long as the trial court’s factual findings are reasonable in light of the record when reviewed in its entirety, the appellate court may not reverse, even though convinced it would have weighed the evidence differently if acting as the trier of fact. Id.
In the instant case, all of the witnesses testified that R.J. is a bright, well-adjusted child and is flourishing academically and socially. Richard testified that he is a good parent to R.J.; Shareese testified that she is a good parent to R.J.[11] They both agreed that the previous custody and visitation schedule had worked in the past.
In weighing the factors set forth in LSA-C.C. art. 134, the trial court noted the following findings:
• Both parents were college students.
• Both parents had “significant” love, affection and emotional ties with R.J.
• Both parents had the capacity and disposition to provide R.J. with love, affection and spiritual guidance and to continue his education and rearing.
• Neither parent had the ability to independently provide food, clothing, medical care for R.J.
• Richard’s family had been financially providing for R.J. most of the child’s life.
• Richard returned to live with his parents to help rear R.J. while continuing his education. -
|in* R.J. had lived with Richard’s family “most of his life.”
• Richard’s family provided a nurturing and stable environment for R.J.
• It was in the best interest of R.J. to continue in the family unit with Richard’s family.
• R.J. attended elementary school in the district in which Richard’s family lived and he is an “A” student.
• Richard attends to R.J.’s day-to-day needs and activities.
The trial court acknowledged that Shar-eese is receiving housing assistance while she is attending college. However, the court noted that if her assistance ended, she may not be able to provide a home for R.J. The court also expressed its concern that Shareese was contemplating applying to medical school. It concluded that Shar-eese’s plans for a more stable future had been “derailed by the fact that [she] failed out of nursing school.”[12] The court further concluded:
*288 [T]he best interest of R.J. is for him to maintain where he is[.]
[[Image here]]
[I] think to take a child who is well-adjusted, happy, loving, good student, healthy, by all regards, and to remove him into a place that would only potentially be that way, only speculatively be that way, but also could potentially be disruptive to that — what has been clearly against his best interest.
We have reviewed this record in its entirety and we are convinced, as |nwas the trial court, that both Richard and Shareese are loving parents. However, the paramount goal in child custody cases is to reach a decision which serves the best interest of the child. The trial court observed the demeanor of the parties and the witnesses and expressly noted that both parties loved R.J. However, the trial court’s conclusion that Richard, with the continued assistance of his parents, was able to provide a stable and safe living environment for R.J. is supported by the facts of this case.
The trial court also considered the prior physical custody arrangement established by the parties and the willingness of Richard and his parents to foster a relationship between R.J. and his mother. It is apparent that the court endeavored to fashion a custody plan for R.J. which would continue his close relationship with both parents, and yet ensure his safety and stability. Moreover, the custody and visitation schedule ordered by the trial court is markedly similar to the previous custody arrangement agreed upon by the parties.
Based on the record before us, we find that the trial court did not abuse its discretion in concluding that it was in R.J.’s best interest to award primary domiciliary custody to Richard, with liberal visitation in favor of Shareese.
CONCLUSION
For the above reasons, the judgment of the trial court is affirmed. Costs of the appeal are assessed to the appellant, Shar-eese L. Finley.
AFFIRMED.

. Richard and his parents testified that Shar-eese's decision to allow R.J. to live with them stemmed from a drug bust that occurred at her mother’s residence in December 2007.

. Richard's father, Lavelle Wilson, Sr., testified that Shareese only visited R.J. "maybe once a month.” Richard’s sister, Jasmine Wilson, testified that R.J. was with her parents "most weekends." According to Jasmine, Shareese only came to get R.J. when the Wilsons called her to come and get him. Judy Wilson, Richard's mother, testified that Shareese only came to visit R.J. "every now and then.”
Conversely, Shareese testified that after she left for college, she picked R.J. up every weekend. Her friends, Brittany Smith and Eunei-sha Brown, corroborated Shareese’s testimony that she picked R.J. up every weekend. However, one witness testified that she picked him up “sometimes on the weekends”; another witness testified that she picked him up "every other weekend” and another witness *284 testified that she picked him up "when she [could] during school.”

. Shareese stated that she had nursing "clini-cals” in Minden every Tuesday from 6:00 a.m. until 6:00 p.m.

. Shareese's status as a college student is unclear. She testified that due to the child custody proceedings, she made poor grades during the Fall 2013 semester and was "kicked out” of the nursing program at Grambling. Shareese also stated that she was changing her major to chemistry and planned to go to medical school. She later stated that she was considering transferring to Delta Community College in Monroe to obtain an associate's degree in nursing.

. She stated that she has worked since high school and the money she spent on R.J. came from her income and refunds she received from college through the Federal Pell Grant Program.

. The Wilsons also testified that Shareese receives federal housing assistance by claiming R.J. as a dependent on her application; Shar-eese admitted that she does so because at the time she applied for the benefits, she “was planning” for R.J. to live with her.

. According to Richard, he supported R.J. with money he earned while working summer jobs and from refunds he received through the Federal Pell Grant Program.

. On Friday March 15, 2013, Shareese went to the Wilson residence to pick up R.J. She was informed that R.J. would not be allowed to leave with her. After she insisted that he be allowed to leave with her, the Wilsons called the Ouachita Parish Sheriff's Department and a deputy instructed Shareese to leave the premises because this "was a civil matter.”

.After the conference, the hearing officer recommended that Shareese be awarded visitation every other weekend. During the school year, on the weeks she did not have weekend visitation, Shareese was awarded overnight visitation from 6:00 p.m. Thursday until 8:00 a.m. Friday. Also, during the summer months, Shareese was awarded "three nonconsecutive two-week periods ..., provided she gives [Richard] notice of the desired weeks in writing by March 1 of each year. If the parties cannot agree or if no notice is given, it will be the first two weeks of June, *286 July and August." The hearing officer had also recommended specific visitation for Mother’s Day, Father’s Day, Easter, Spring Break, Thanksgiving and Christmas. The order further provided that should either parent have to work during his or her periods of visitation, then he or she "shall contact the other parent and offer them the right of first refusal to care [for] the minor child before leaving the minor child with another family member or babysitter.” As stated above, Shareese objected to the hearing officer's recommendation and the case was fixed for trial.

. LSA-C.C. art. 134 provides, in pertinent part:
Such factors may include:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.

. Richard testified that Shareese is a good mother to R.J.; however, although Shareese described Richard as a "good father” in her deposition testimony, during the trial she refused to admit that he is a good father. Rather, she described his relationship with R.J. as "more like a brother.” Shareese further testified that Richard's mother plays the role of R.J.’s "father” more than Richard. She admitted that she consulted with Mrs. Wilson regarding decisions concerning R.J., rather than calling Richard.

. The court concluded that even if Shareese were to improve her GPA and be accepted into medical school, her plans to commute from Monroe to LSU-Shreveport were unrealistic and impractical.