Judgment rendered August 14, 2019.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 52,915-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *


ROY STEVEN CALHOUN                    Plaintiff-Appellee

versus

JENNIFER ANNE LEVINSON                Defendant-Appellant
CALHOUN

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 20151292

Honorable Alvin Rue Sharp, Judge

* * * * *

DONALD L. KNEIPP                      Counsel for Appellant
RICHARD L. FEWELL, JR.

BREITHAUPT, DUNN, DUBOS,              Counsel for Appellee
SHAFTO & WOLLESON, L.L.C.
By: Robert Alan Breithaupt


* * * * *

Before PITMAN, STONE, and COX, JJ.

**STONE, J.**

The appellant, Jennifer Anne Levinson Calhoun ("Jennifer") has appealed the trial court's judgment which denied her rule to modify custody and to request a custody evaluation, and granted the request to modify custody filed by the appellee, Roy Steven Calhoun ("Steve"). For the following reasons, we affirm.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Jennifer and Steve (collectively referred to as "the Calhouns"), entered into a covenant marriage on April 8, 2006. Their child, E.M.C., was born on November 5, 2009. Steve is employed as a real estate attorney with a solo practice, while Jennifer is employed as a pediatric nurse practitioner. In March 2011, Jennifer self-reported her prescription medication addiction to the Louisiana State Board of Nursing ("nursing board"), and enrolled in the Recovering Nurse Program ("RNP"). She entered rehabilitation at Palmetto Addiction Recovery Center for a total of 12 weeks, which included 6 weeks of on-campus residential treatment. Jennifer also signed a monitoring contract with the nursing board for a period of 3 years which required her to: 1) attend four Alcoholics Anonymous ("AA") meetings per week; 2) attend RNP meetings once per week; 3) work AA's "12 step program;" 4) attend aftercare once per week; and 5) remain in contact with her AA sponsor.

Jennifer successfully completed the requirements for the RNP in April 2014, but subsequently relapsed in or around November or December of the same year. On April 28, 2015, Jennifer was arrested for driving while intoxicated ("DWI"); the Calhouns physically separated the same day. The following day, Jennifer again, self-reported to the nursing board. She was

subsequently admitted to Pine Grove, a detoxification and rehabilitation center located in Hattiesburg, MS, for a period of 90 days. On May 5, 2015, Steve filed a petition for divorce on the grounds of habitual intemperance, cruel treatment, excesses, and outrages pursuant to La. R.S. §9:307(B)(6).[1] He also filed for a temporary restraining order seeking temporary sole custody of E.M.C., alleging that Jennifer had a history of alcohol and prescription drug abuse.

On May 8, 2015, the trial court granted Steve temporary sole custody of E.M.C. without setting a visitation plan ("May 8th judgment"). However, the trial court did grant Jennifer visitation supervised by her mother, Brenda Levinson ("Brenda") for a period of no more than 4 hours, if recommended by her treatment facility. The trial court set a hearing for May 28, 2015, for Jennifer to show cause as to why Steve should not be granted temporary sole custody until such a time as a hearing is held to determine a permanent custody award. At the hearing, the parties filed a joint motion and consent order which ordered all the provisions of the May 8th judgment to remain in effect.

On May 29, 2015, Jennifer filed an answer to Steve's petition for divorce, denying the existence of any grounds for the divorce, and seeking both interim and final spousal support. On November 5, 2015, Steve filed a first supplemental and amended petition for divorce, requesting that Jennifer be ordered to pay child support pursuant to La. R.S. 9:315. Due to the recusal of the initial hearing officer assigned to this case, the first hearing

---

[1] La. R.S. 9:307(B)(6) provides: Notwithstanding any other law to the contrary and subsequent to the parties obtaining counseling, a spouse to a covenant marriage may obtain a judgment of separation from bed and board . . . [O]n account of habitual intemperance of the other spouse, or excesses, cruel treatment, or outrages of the other spouse, if such habitual intemperance, or such ill-treatment is of such a nature as to render their living together insupportable. *See* La. R.S. §9:307(B)(6).

2

officer conference ("HOC") took place on November 16, 2015. On December 21, 2015, the trial court issued a temporary order making the hearing officer conference report ("HOCR") rendered on November 16, 2015 ("November HOCR") a temporary order of the court, and fixed the next HOC for February 16, 2016 ("February HOC").

In the November HOCR, the hearing officer determined that an award of sole custody to Steve, as opposed to joint custody with Jennifer, was in E.M.C.'s best interest. The November HOCR also ordered that:

1) Jennifer would have visitation with E.M.C. supervised by Jennifer's mother, Brenda, every other weekend from Friday at 6 p.m. until the following Sunday at 6 p.m.;
2) The parties were to follow a specific holiday and special occasions visitation schedule set by the hearing officer;
3) The parties were required to exchange contact information;
4) The parties were prohibited from having overnight guests of the opposite sex during visitation, using alcohol and/or prescription drugs, and discussing current and pending legal proceedings with and in the presence of E.M.C.;
5) Steve was ordered to maintain medical insurance coverage for Jennifer, and to pay the automobile note and insurance on the vehicle driven by Jennifer in lieu of spousal support; and
6) Steve was awarded exclusive use of the former matrimonial domicile and Jennifer was awarded the rental value of the matrimonial domicile set at $1,274 per month.

On February 18, 2016, both parties filed objections to the November HOCR disputing the hearing officer's findings of fact and recommendations.[2] After the February HOC, the trial court issued another temporary order making the HOCR rendered on February 16, 2016 ("February HOCR") a temporary order of the court. The

_____

[2] Specifically, both parties alleged that the hearing officers' findings related to income, earning capacity, and expenses were incorrect and overstated. Jennifer objected to the award of sole custody in favor of Steve and her visitation being supervised by Brenda. Steve objected to the requirement that he maintain health insurance coverage for Jennifer in lieu of paying spousal support

provisions contained in the February HOCR were nearly identical to those set forth in the November HOCR with the following revisions:

1) Jennifer was ordered to pay $100 in child support; and
2) Steve was ordered to provide and maintain health, dental, prescription drug, vision, and orthodontic insurance coverage for E.M.C. and medical insurance coverage for Jennifer.

On April 18, 2016, Jennifer filed a motion and order to set hearing date for her and Steve's previously filed objections to the November HOCR. The trial court subsequently issued an order setting the objections hearing on November 29, 2016. On September 21, 2016, Steve filed a rule for contempt alleging that Jennifer had violated the May 28, 2015 joint motion and consent order and the December 17, 2015 temporary order, by withdrawing the funds from her retirement accounts, which were presumptively considered community property. The trial court set the hearing on the rule for contempt on the same date as the hearing for Jennifer's objection.

On October 24, 2016, Jennifer filed an answer to the rule for contempt admitting that she had liquidated the retirement accounts because she had no other means for support. On the morning of November 28, 2016, one day before the scheduled hearing, Steve's attorney sent Judge Sharp a letter indicating that the parties were currently in the process of confecting a consent judgment in which they would settle all the issues before the court in this matter.

On June 7, 2017, Steve filed a petition for final divorce and moved for a preliminary default on July 17, 2017. Upon confirmation, the trial court rendered a judgment of divorce on July 18, 2017. Eight days later, on July

26, 2017, Jennifer filed a rule to modify custody and request custody evaluation alleging that there had been material and substantial change in circumstances of such a nature and degree that continuing to have Steve designated as domiciliary parent was so deleterious to the child as to justify modification of the custody decree. Jennifer further requested that Dr. John Simoneaux ("Dr. Simoneaux") be appointed as an expert and that both parties submit to a custody evaluation.

On September 26, 2017, Steve filed an answer to Jennifer's rule to modify custody and request custody evaluation, alleging that an increase in Jennifer's custodial time would not be in E.M.C.'s best interest. The trial court referred Jennifer's rule to the hearing officer rather than setting a hearing date, and an HOC was subsequently set for October 11, 2017 ("October HOC"). After the October HOC, the trial court issued a temporary order making the October HOCR a temporary order of the court. The October HOCR ordered the following:

1) The parties would share joint custody of E.M.C. with Steve still designated as the domiciliary parent;
2) Jennifer would have visitation every other weekend from Friday at 3 p.m. to Monday at 8 a.m.; and, Thursdays from 3-8 p.m. during the weeks when she does not have weekend visitation;
3) A specific visitation plan for holidays and special occasions was established;
4) Jennifer would be entitled to four non-consecutive one-week periods provided that she give Steve notice of the desired weeks in writing by March 1st of each year;
5) Each party would be given the first option to provide care and supervision of E.M.C. for periods of time in excess of 8 hours;
6) In the event the parties decide that E.M.C. needs counseling, they must reach an agreement on the counselor and split costs;

7) Jennifer shall obtain and provide Steve with drug and alcohol test results;

8) Steve has the right to require Jennifer to submit to a drug test within 48 hours of written notice to be provided through her counsel of record;

9) Neither party will communicate about the legal proceedings in the presence and/or hearing of E.M.C.;

10) Neither party will attempt to convince E.M.C. not to spend custodial time with the other parent;

11) Neither party will post any information regarding the child or other parent through social media channels, including Facebook and Instagram, without the express consent of the other parent.

12) E.M.C. is prohibited from being alone with Bill Levinson ("Bill"), E.M.C.'s maternal grandfather or Tim Wakeman ("Tim"); and,

13) Jennifer's request for custody evaluation was denied.

\*\*\*

On October 18, 2017, both parties filed objections to the HOCR. Steve specifically made the following objections:

1) Jennifer's visits should end on Sunday evening at 6 p.m.;

2) The parties already agreed that Steve would enjoy the Easter 2018 holiday with E.M.C.;

3) The best interest of the child dictates that Jennifer should not receive more than two non-consecutive one week periods of visitation with E.M.C. and prohibits Jennifer from discussing this litigation with E.M.C.;

4) Neither Bill nor Tim shall be considered a "responsible adult" for custody purposes; and,

5) Steve reserves his right to be notified of Jennifer's anticipated pay increase from her return to work.

\*\*\*

Jennifer objected to the following:

1) The hearing officer's recommendation of Steve as the domiciliary parent;

2) The hearing officer's recommendation that the parties should alternate custody every week on a year-round basis;

3) The requirement of providing Steve with written notice for the anticipated summer visitation schedule as early as March 1st; and,

4) The denial of her request for a custody evaluation.

\*\*\*

6

On October 20, 2017, Steve filed a rule to increase child support pursuant to prior stipulations by the parties that Jennifer had returned to work as a nurse practitioner in either March or April of 2017, and was under an obligation to inform Steve. The next HOC took place on March 21, 2018 ("March HOCR"), after which the hearing officer rendered her report. On March 27, 2018, the trial court rendered a consent judgment on custody and support in open court ordering:

1) The parties shall have joint custody with Steve designated as the domiciliary parent;
2) Jennifer shall enjoy unsupervised visitation in accordance with the joint custody plan of implementation contingent upon her continued sobriety;
3) Jennifer shall pay $594.23 per month to Steve for child support;
4) Steve shall maintain health and hospitalization insurance for E.M.C.;
5) Jennifer shall notify Steve of her return to work as a nurse practitioner and provide Steve with a copy of her employment contract or other documentation setting forth the terms of her employment and compensation;
6) Both parties shall be responsible for one-half of any other expenses of E.M.C.;
7) Jennifer shall obtain and provide Steve with drug and alcohol test results, and Steve has the right to require Jennifer to submit to a drug test within 48 hours of written notice to be provided through her counsel of record;
8) Child support for E.M.C. is to be recalculated as of April 2017, based on Jennifer's return to work as a nurse practitioner;
9) Both parties waive and relinquish forever any and all rights or claims to spousal support of any kind and nature;
10) Both parties' objections to the HOCR are denied; and,
11) The heightened Bergeron standard of proof shall be required    for any attempted modification of the custody or visitation of E.M.C.

\*\*\*

On that same day, Jennifer filed an objection to the March HOCR alleging that:

1) Steve earns more income than the amount stated in the HOCR;
2) The health insurance premium for E.M.C. is less than the amount stated in the HOCR;
3) Steve has a greater earning capacity and is capable of earning more income as a practicing attorney; and,
4) Steve failed to provide 2 years' worth of bank statements.

\*\*\*

Steve also filed an objection to the March HOCR, alleging that it failed to hold Jennifer responsible for her proportionate share of expenses related to E.M.C.'s extracurricular activities. On April 4, 2018, the trial court issued a temporary order making the March HOCR an interim order of the court. The March HOCR ordered the following:

1) Jennifer is ordered to pay child support of $1,200 retroactive to April 1, 2017, and payable in two installments on the 1st and 15th of each month.
2) Steve is ordered to provide health, dental, prescription drug, vision, and orthodontic insurance coverage for E.M.C.; and
3) E.M.C.'s uninsured health care expenses shall be paid equally by the parties. Each party shall provide the other with copies of receipts within 30 days of the expense being incurred or waive the right to reimbursement. Reimbursement shall be made within 30 days of receipt of said copies.

\*\*\*

Due to multiple scheduling conflicts, the trial court issued an order setting both parties' objections and Steve's rule for contempt for hearing on the dates of October 2, 3, and 4, 2018. At the hearing, a total of ten witnesses, including Steve, Jennifer, and Brenda, testified. At the conclusion of the hearing, the trial court invited both parties to submit "one shot" briefs by October 31, 2018, on the issue of whether a material change of circumstances had occurred since the prior rulings in this case, and if so, whether the changes sought were in the overall best interest of E.M.C. On December 14, 2018, the trial court issued its judgment in favor of Steve.

8

The court found that a material change of circumstances, within the meaning of our law, had not been shown in this case, nor at that time. Further, the trial court concluded that Jennifer's requested changes were not in the overall best interest of E.M.C. Jennifer filed the instant appeal, asserting three assignments of error.

## DISCUSSION

*Change in Circumstances*

By her first assignment of error, Jennifer argues that the trial court erred in finding that she failed to prove a material change in circumstances. She contends that under the circumstances she was entitled to an increase in her custodial time.

The paramount consideration in any determination of child custody is the best interest of the child. La. C.C. art. 131; *Evans v. Lungrin*, 1997–0541 (La. 2/6/98), 708 So. 2d 731; *Semmes v. Semmes*, 45,006 (La. App. 2d Cir. 12/16/09), 27 So. 3d 1024. The court is to consider all relevant factors in determining the best interest of the child. La. C.C. art. 134. The trial court is not bound to make a mechanical evaluation of all of the statutory factors listed in La. C.C. art. 134, but should decide each case on its own facts in light of those factors. *Semmes, supra*. These factors are not exclusive, but are provided as a guide to the court, and the relative weight given to each factor is left to the discretion of the trial court. *Id*.

La. R.S. 9:335(A)(2)(b) provides that to the extent feasible and in the best interest of the child, physical custody of the child should be shared equally. Yet, when the trial court finds that a decree of joint custody is in the best interest of the child, the statute does not necessarily require an equal sharing of physical custody. *Id*. Substantial time, rather than strict equality

of time, is mandated by the legislative scheme providing for joint custody of children. *Semmes, supra; Gaydon v. Gaydon*, 45,446 (La. App. 2 Cir. 5/12/10), 36 So. 3d 449; *Pender v. Pender*, 38,649 (La. App. 2d Cir. 5/12/04), 890 So. 2d 1.

Continuity and stability of environment are important factors to consider in determining what is in the child's best interest. *Pender, supra.* The trial court has vast discretion in deciding matters of child custody and visitation. *Semmes*, *supra*; *Slaughter v. Slaughter*, 44,056 (La. App. 2d Cir. 12/30/08), 1 So. 3d 788; *Semmes, supra.* This discretion is based on the trial court's opportunity to better evaluate the credibility of the witnesses. *Id.*

Generally, the determination by the trial court regarding child custody is entitled to great weight and should not be disturbed on appeal absent a clear abuse of discretion. *Gaydon, supra; Pender, supra.* Courts have inherent power to determine a child's best interest and to tailor a custody order, including visitation that minimizes the risk of harm to the child. *Moore v. Moore*, 47,947 (La. App. 2 Cir. 3/6/13), 111 So. 3d 1129; *Beene v. Beene*, 43,845 (La. App. 2 Cir. 10/22/08), 997 So. 2d 169. Appellate court[s] should be reluctant to interfere with custody plans implemented by the trial court in the exercise of its discretion. *Gaydon, supra; Pender, supra*.

In this case, while we recognize the significant strides that Jennifer has made, we find the record devoid of any evidence that the trial court abused its discretion by concluding that: (1) Jennifer failed to show a material change in circumstances; and (2) her proposed modifications were not in E.M.C.'s overall best interest.

10

In her appellate brief, Jennifer alleges several lifestyle and employment changes which necessitate the modification of the current custody plan. Jennifer maintains that since the prior rulings in this case, she has remained clean and sober for over 2 years, and she has purchased a home in West Monroe that is located an estimated five minutes away from E.M.C.'s school. She also places heavy emphasis on the strong emotional bond between herself and E.M.C.; the child's alleged preference to live with her; her regular attendance at E.M.C.'s extracurricular activities; and, Jennifer's ability to provide for E.M.C. as material changes since the original custody decree. Although these alleged changes can be considered somewhat significant, given the prior events that have transpired, these cited circumstances also appear self-serving and superfluous, as these provide only negligible benefits to E.M.C.'s well-being. Thus, like the trial court, we cannot conclude that the circumstances cited by Jennifer actually rise to the level of material changes within the meaning of the law.

Most importantly, we note that by Jennifer's own admission during her trial testimony, "she has to prove herself." A review of the trial transcript reveals the following exchange between Jennifer and the trial court:

> THE COURT: Ms. Jennifer, if you don't mind, I want to tell you what I'm feeling and what I'm hearing and it's a truncated or summarized statement. But tell me if I'm in left field, okay, or if I'm in center field. And anything that I'm saying is a perhaps because I could have it wrong, okay. But what I'm hearing is you're saying, look, all of this stuff y'all talking about, yeah, it happened. Yeah, I had been frustrated and I said things. Yeah, I took the drugs and the alcohol and even, you know, whatnot and – and you know, you can show – however it is that you want to look at it. I'm telling you how it is but y'all can look at it however y'all want to look at it. I mean that's y'all whoever y'all is. And yeah, me and Mr. Calhoun we – we ain't the best communicators and we may not necessarily be the best facilitators in a combined fashion. But, Judge, all I'm

11

trying to do is get a little more time with my boy because not only is that not what I want but that's what he told me he wanted. And almost – remember I said perhaps, remember? Almost any kind of way that the law would allow that to happen I'm down with it. Is that what you're saying?

MS. LEVINSON: Yes, sir.

THE COURT: Not eloquently stated but that's the bottom line?

MS. LEVINSON: Yes, sir.

THE COURT: Now, watch this now. This here is not necessarily what I'm hearing. I can't hear anything on this but I need to hear something on it from somebody. Do you have a thought as to if that was to happen what could be utilized not only to make it happen but to fortify and secure the happening of it? Meaning this: I counted – I might be wrong but I think it was at least four years between the initial occurrence [and] the relapse [*sic*]. Maybe three years. I can't re- -

MS. LEVISON: I believe – I believe it was about four. Yes, sir.

THE COURT: All right. The argument could be made is [*sic*], look, the baby ain't even – ain't even a teenage yet and if she's done [*sic*] relapsed at three years, four years, whatever the case, Judge, chances are we need to be very careful because she is probably going to relapse again. Or it is arguable that she could relapse again in three years or four years or even before. What can you do to fortify or assist with that? The next thing is you said at one point you went in to the guest bedroom or the other bedroom, whatever it was, and you know you tied one or two on. Maybe one or two too many and whatnot. You know, what can we do to deal with that?

MS. LEVINSON: Yes, sir.

THE COURT: And the other particulars, you know, that, you know [*sic*], perhaps is logical to be concerned about what you can do, what can you offer, what can you put forth to address and fortify that? Do you have a thought on it?

MS. LEVINSON: Yes, sir. I know that the – I think that the – and my words are not correct but the filing or the pleading, you know, I asked – we asked for primary domiciliary status, you know, just go to me. Today I sit before you and I – I don't want that. I don't – **I think I still have to prove myself.** I would love

it if we could just do like a week with me and a week with Steve. I think it's already in the court document or – or something that Steve could drug test me at any time. My contract with the nursing board is up I believe in May. I would be willing to extend that however long the court thought I needed to do it for Steve to be able to drug test me whenever he wanted. You know, the fact that my mom is now retired and she's getting her house ready to put on the market to sell it that she will be here to help me because I don't have any other family besides my mom and [E.M.C.] and my husband. And so for her to be able to pick him up from school because I am at work, take him to school because I do have to – I work in Ruston. I think that that's a safeguard that's in place as well. I also think that because [E.M.C.] is smart and intelligent and he does have a phone now and if – if Steve would like I mean he could of course take it to his house with him if – if that would make things easier. But the fact that Steve's numbers are in there, his mom and dad's numbers are in there, [E.M.C.] knows how to dial 911 if, you know, - if he was scared. And then my mom is there. My husband is there. It's not like it would be just me and [E.M.C.]. And I understand that people are worried that there would be another relapse. I think that's only natural but I also think that as much as I've struggled in the past that I am a different person today. And I – I want to be a good mom and I'm doing the best that I can and I – I think that [E.M.C.] – if you did talk to him – would tell you that he misses me and that he wants to spend time with me and I think we both need that. I think that [E.M.C.] for his emotional wellbeing [*sic*] needs it. And I think that I have proven myself here sitting before you three and a half years sober. My sobriety I – I don't put anything above my sobriety because if I put anything above my sobriety I'll lose it. Because if I'm not sober I lose my son. I lose my husband. I lose my job. I lose everything. So my sobriety – and I've had to be so self-sufficient this time. The first time I went right back to living with Steve. He was working. I didn't worry about bills. I – I – I didn't have, you know, I didn't have any consequences like I said before. And when I got out of treatment this time and they recommended the halfway house and I lived there for six to seven months. You know, you're considered homeless when you live in a halfway house and, I mean, I applied for food stamps and I worked as a receptionist for ten dollars an hour. And then I was able to work as an RN, and then I finally was able to work as a nurse practitioner again and take care of children which is what I love. And I feel like that if the regulatory agency that is the Louisiana State Board of Nursing, it's one of the hardest nursing boards in the country, tells me, yes, Jennifer, go and

take care of any child in the state of Louisiana, prescribe them medicine, prescribe them narcotics, I think that says a lot. But then I look at my own life and I'm only allowed to be with my child every other weekend. So I hope I answered your questions. (Emphasis added).

*\*\**

Based on the evidence entered into the record, including the foregoing exchange and the testimony of other witnesses, the trial court found that maintaining Steve as domiciliary parent was in E.M.C.'s best interest. In its written ruling on custody, the trial court noted that the overwhelming majority of factors listed in La. C.C. art. 134 favored Steve alone. Four factors favored both Steve and Jennifer equally, *but none favored Jennifer alone*. (Emphasis added.) In addition, the trial court attached an "Article 134 Checklist" which apportioned a number between 1 and 5 to each factor. Steve's total of points as related to the weight of each factor totaled 19, whereas Jennifer's totaled 6. Thus, to that end, we find that the trial court was within its vast discretion in maintaining E.M.C.'s current custodial scheme.

*Increase in Time*

Jennifer next contends that an increase in time for visitation was warranted by the evidence. She argues that the trial court erred in ruling for Steve when it ordered to have an earlier "time ending" to weekend visits and an earlier "time ending" to Thursday visits with her, despite the fact that Steve never filed a formal request. In her brief, Jennifer alleges that her visitation was reduced to less than 95 days per year.

In support, Jennifer cites *Wilson v. O'Neal*, 50,711 (La. App. 2 Cir. 4/13/16), 193 So. 3d 207, wherein this Court held that visitation of 67 days per year is simply not sufficient time to effectuate the intent of the

14

legislature as set forth in La. R.S. 9:335, which is that the time periods during which the parent has physical custody of the child would be enough to assure the child of frequent and continuing contact with both parents. Based on *Wilson*, *supra*, Jennifer maintains that visitation of 67 to 95 days per year of a parent and child is just not enough time. We disagree.

As stated previously, the determination by the trial court regarding child custody is entitled to great weight and should not be disturbed on appeal absent a clear abuse of discretion. *Gaydon, supra; Pender, supra.*

A review of the record reveals that Steve requested that Jennifer's visitation conclude on Sunday at 6 p.m., as opposed to Monday at 8 a.m., and two hours earlier on Thursdays, at 6 p.m. rather than 8 p.m. At trial, Steve testified that he requested earlier "ending times" due to E.M.C.'s constant exhaustion and performance in school after visitation periods. Numerous witnesses testified that E.M.C. is a very intelligent and active child who participates in extracurricular activities, including children's choir, youth basketball leagues, and Taekwondo. Steve testified that E.M.C. is a straight "A" student, but noticed that E.M.C.'s grades began to decline once visitation with Jennifer was incorporated in to his school and extracurricular activity schedule. For the same reasons that were stated in the preceding section, which are hereby incorporated by reference, we find that the trial court did not abuse its discretion by modifying the "ending times" of visitation periods with Jennifer.

*Child Support*

Jennifer argues, in her third and final assignment of error, that the trial court erred by increasing her child support obligation despite Steve's failure

15

to produce his tax returns and cite any change in circumstances warranting an increase.

The Louisiana Child Support Guidelines set forth the method for implementation of the parental obligation to pay child support. La. R.S. 9:315, *et seq.*; *Strange v. Strange*, 42,318 (La. App. 2d Cir. 6/20/07), 960 So. 2d 1223. The guidelines are intended to fairly apportion between the parties the mutual financial obligation they owe their children in an efficient, consistent, and adequate manner. *Strange, supra.* Child support is to be granted in proportion to the needs of the children and the ability of the parents to provide support. *Id.*

The guidelines are to be used in any proceeding to establish or modify child support. La. R.S. 9:315.1(A); *Strange, supra.* The guidelines are mandatory and provide limits and structure to the trial court's discretion in setting the amount of support. The trial court's child support judgment will not be disturbed absent a clear abuse of discretion. *Id.*; *See also Kellogg v. Kellogg*, 375 So. 2d 200 (La. App. 2d Cir. 1979); *Culpepper v. Culpepper*, 514 So. 2d 701, 702 (La. Ct. App. 1987); *Seal v. Bell*, 464 So. 2d 1026 (La. App. 1st Cir.1985); *Kuhn v. Kuhn*, 420 So. 2d 1026 (La. App. 5th Cir. 1982); *Durbin v. Durbin*, 424 So. 2d 1130 (La. App. 1st Cir.1982).

There is a rebuttable presumption that the amount of child support obtained by use of the guidelines is proper and in the child's best interest. La. R.S. 9:315.1(A). Child support awards are always subject to increase or modification if the needs of the child and/or the ability of the parent to pay so warrants. *Pettitt v. Pettitt*, 261 So. 2d 687 (La. App. 2d Cir.1972). The party seeking an increase, however, is generally required to prove a change in circumstances of one or both parents. *Pettitt, supra.*

16

A party seeking a reduction in child support must show a material change in circumstances of one of the parties between the time of the previous award and the time of the motion for modification of the award. La. C.C. art. 142; La. R.S. 9:311(A); *Strange, supra*; *Jones v. Jones*, 44,201 (La. App. 2 Cir. 4/8/09), 6 So. 3d 1275.

In this case, the trial court did not deviate from the Louisiana Child Support guidelines ("the guidelines") in ordering Jennifer to pay $1,253 monthly. Instead, the trial court imputed Jennifer's increased salary into the calculation of support for E.M.C. During trial, Jennifer testified that she earned an annual income of $125,000; this figure did not include bonuses. According to the joint obligation worksheet attached to the trial court's written judgment, Jennifer's monthly gross income was calculated as $10,416, while Steve's was calculated as $6,256. The guidelines set the basic child support obligation as $1,653 for Jennifer and Steve's combined gross income of $16,672. After E.M.C.'s health insurance premium of $412.61 was added to the basic support obligation, the total child support obligation was calculated at $2,006.49 with Jennifer's payment equaling $1,253, or 62.48% share of the combined gross income. Thus, we cannot say that the trial court committed manifest error by ordering Jennifer to pay child support in the amount of $1,253 per month.

Moreover, Jennifer also questions the trial court findings of a material change in circumstances warranting an increase in child support, yet not warranting an increase in visitation with her. An automatic deviation from the child support guidelines is not allowed. *Guillot v. Munn*, 99–2132 (La.3/24/00), 756 So. 2d 290; *Jones v. Jones*, 38,790 (La. App. 2d Cir. 6/25/04), 877 So. 2d 1061. All that is required by La. R.S. 9:315.8(E) is that

17

the trial court consider the period of time spent with the non-domiciliary parent as a basis for adjustment of the child support obligation. *Semmes, supra; Jones, supra; Falterman v. Falterman*, 97–192 (La. App. 3d Cir.10/8/97), 702 So. 2d 781, *writ not considered*, 98–0076 (La. 3/13/98), 712 So. 2d 863.

The statute does not mandate an adjustment for time spent, nor does it remove from the trial court the discretion to decide whether to make an adjustment. *Id.* There is no hard and fast rule to determine just how much, if any, to reduce the child support obligation based on the percentage of time the children live with either parent. *Id.*

In her brief, Jennifer does not cite any jurisprudence or authoritative source to support her assertion that child support obligations should correlate to the amount of visitation each parent receives. From our review of the record and jurisprudence, custodial schemes and support obligations do not operate in a *quid pro quo* manner. We decline to make such a determination in the matter *sub judice*. Moreover, we find that there is ample evidence in the record to support the modification of Jennifer's child support obligation, including her own trial testimony where she indicated her current salary was $125,000 per year excluding bonuses. Accordingly, we find that the trial court did not abuse its discretion by increasing Jennifer's child support obligation.

## CONCLUSION

For the foregoing reasons, we affirm the trial court judgment denying Jennifer's rule to modify custody and to request a custody evaluation. In addition, we affirm the judgment of the trial court to modify Steve's custody

18

and grant an increase in Jennifer's child support based on her testimony.

Costs of this appeal are assessed to the appellant, Jennifer Anne Levinson Calhoun.

**AFFIRMED.**