WILLIAMS, J.
In this child custody dispute, the defendant, Lindsay Diane Way, appeals a trial court judgment awarding sole custody of the minor child to the plaintiff, William Artmer Lucky, IV, and granting her supervised visitation. She also challenges the appointment of a mental health professional to evaluate the parties. For the following reasons, we affirm.
FACTS
William Artmer Lucky, IV ("William")[1] and Lindsay Diane Way ("Lindsay") were involved in a relationship which resulted in the birth of "Quincy," who was born August 31, 2007. William and Lindsay never married, and the relationship ended soon after Quincy's birth.
On March 19, 2008, Lindsay took Quincy to her home state of Pennsylvania. According to William, Lindsay told him that she was traveling to Pennsylvania to visit her family; however, once she arrived, she *113 informed him that she was going to enroll in a graduate program at the University of Pittsburgh, and she did not intend to return Quincy to the state of Louisiana.
On April 23, 2008, William filed a petition seeking sole custody of Quincy and an order to require Lindsay to return Quincy to Louisiana. In the alternative, he sought to be named domiciliary parent. Further, William sought a judgment to be declared Quincy's biological father.
On July 3, 2008, Lindsay filed a reconventional demand, seeking sole custody of Quincy and to be designated domiciliary parent.[2] Lindsay also requested that a mental health professional be appointed to evaluate William "and any other persons deemed necessary by said mental health professional to make recommendations to the court as to the best interest of the minor child[.]"
On October 30, 2008, the parties filed a joint motion to have Dr. Mark Vigen evaluate William, Lindsay and Quincy. Initially, Dr. Vigen served as the mental health evaluator and facilitated visits between William and Quincy, whereby Lindsay would return to Louisiana with the child for overnight visits with William.[3] Over the following year, the parties filed numerous motions and pleadings.[4] On January 21, 2010, the court substituted Sandi Davis as the mental health professional for the parties and Quincy.
Following a trial conducted on May 11, 12 and 14, 2010, a judgment was rendered, finding that William was the biological father of Quincy. Further, William and Lindsay were awarded "the joint care, custody and control of" Quincy. The parties entered into a "Joint Custody Implementation Plan" as follows: the parties alternated physical custody weekly, with the noncustodial parent being granted three hours of visitation on Wednesdays, if desired; each parent would serve as domiciliary parent during the week they enjoyed physical custody; Louisiana would be the legal domicile of Quincy and that any relocation would be governed by La. R.S. 9:355.1, et seq. ; and Quincy would attend First Baptist Church School ("First Baptist"). Additionally, specific provisions were made for summer months and holidays. Moreover, the trial court appointed Sandi Davis as the parenting coordinator.
In June 2010, Lindsay voluntarily returned to Louisiana with Quincy. Thereafter, both parties filed rules for various reasons.[5]
*114 The latest custody dispute commenced in April 2015, when William filed a rule seeking to be appointed sole domiciliary parent. He alleged numerous facts against Lindsay regarding the time Quincy was with her. Most of these allegations concerned Quincy's participation in sports, his education and his ability to communicate with his father.[6] William also requested that Sandi Davis be reappointed as parenting coordinator.
On June 19, 2015, Lindsay filed an answer denying William's allegations. She asserted that William did not want Quincy to participate in baseball or any sports in which she was coaching because of his desire to alienate Quincy from her. She also asserted that William's allegations regarding *115 Quincy's education were false and that William had never before shown any interest in Quincy's education.[7] Further, Lindsay maintained that William failed to provide any reasons for his allegation that her employment as a teacher at First Baptist was detrimental to Quincy.[8]
Additionally, Lindsay filed a reconventional demand, seeking sole custody of Quincy, or in the alternative, to be designated sole domiciliary parent. She alleged as follows: William had "knowingly and intentionally" violated the joint custody order by depriving her of her Wednesday night visitation during her "off" week; William had enrolled Quincy in an extracurricular activity, without her knowledge, and had refused to provide her with any details of the activity so that she could attend Quincy's events; William attempted to remove Quincy from First Baptist and had sought tutoring for him without discussing it with her; William had refused to sign the new enrollment contract for Quincy's attendance at First Baptist and had attempted to arrange a meeting at the school without her knowledge; William had contacted Quincy's baseball coach and told him that Quincy would be removed from the team if Lindsay was allowed to act as assistant coach; William had instructed Quincy not to speak to her or acknowledge her at school during William's days of domiciliary custody; and William allowed Quincy to ride "four-wheelers" without wearing a helmet.
Thereafter, William obtained another attorney and filed a myriad of pleadings, motions and other notices. Most of the filings arose from Lindsay's alleged interference with William's ability to communicate with Quincy when he was in Lindsay's custody, William's desire to enroll Quincy in another school, and various issues with certain people with whom Lindsay associated.[9] William also sought orders to appoint Sandi Davis as the mental health professional, Shelley Booker, LCSW, as parenting coordinator and for Lindsay to undergo a forensic psychiatric evaluation.[10]
*116 On July 15, 2016, the trial court signed a judgment that provided as follows: (1) Quincy "shall not return as a student to First Baptist Church School for the 2016-2017 school year";[11] (2) Lindsay was permanently enjoined from "exposing [Quincy] to Gregory Cooper Bell in any manner whatsoever"; and (3) the joint custody plan was modified such that physical custody would continue on a week/on week/off basis during the summer months and the "off-Wednesday" visits were eliminated. On July 20, 2016, the parties stipulated that Quincy would be enrolled in A Kid's Choice Foundation and that the director of A Kid's Choice would be given "exclusive authority" to "reintegrate [Quincy] into a conventional school setting."
On August 31, 2016, Davis filed a detailed 30-page report with the trial court. Davis recommended that William be designated primary domiciliary parent and "have sole decision making in the area of medical care, educational development and spiritual guidance for Quincy." Davis also recommended that Lindsay have visitation every other weekend, and for a three-hour period "during the off week." In the report, Davis stated the following:
The parties are in conflict over anything and everything involving [Quincy];
We agree that this back and forth chaos is unnecessary and needs to cease;
Based on all we have seen, the parties in this case can no longer do a shared custody arrangement. * * * I understand that joint custody means joint decision-making. Over the years, we have seen [William and Lindsay's] co-parenting communication decline, as we have also seen Lindsay's involvement in other activities/as other people have recognized her uncommon/peculiar methods of interactions when it comes to Quincy.
Joint decisions will not work in this case, as we have seen a defiant attitude when given specific instructions, as Lindsay tends to be more focused on her own agenda, which hinders her ability to be flexible and cooperative. Lindsay shows a pervasive pattern of instability of interpersonal relationships. In my opinion, she shows frantic efforts to avoid real or imagined abandonment, specifically as it relates to her relationship with Quincy;
[William] has shown displays of hostility towards Lindsay, which has resulted in him expressing his negativity in front of Quincy. He shows a willingness to be more mindful of his temperament, and *117 has avoided interactions with others, including school faculty [at First Baptist] and mostly avoiding Lindsay and her counterparts. [William] has removed Quincy from certain school events in hopes of avoiding conflict that would arise from coming face to face with Lindsay. He recognizes that he has had a difficult time containing his anger and frustrations; therefore, he makes decisions to circumvent what might be a more difficult encounter.
The details that Davis documented regarding her sessions with Quincy were quite troubling. According to Davis, Quincy had expressed the following: Lindsay instigates arguments with William and his current wife during his (Quincy's) school and extracurricular events; Lindsay told him that William "wanted to kill him before he was born"; at times, he did not want to return to Lindsay's house and would rather stay with William; he does not "feel safe" at Lindsay's house; if he had his way, he would spend one month with William and two days with Lindsay; Lindsay "always talks on the phone with someone about 'court' "; he hated First Baptist because he did not have many friends and other children "picked on" him; he was unable to "get caught up" in his school work at First Baptist; Lindsay "lies all the time"; his stepmother attempted to pick him up from school one day and Lindsay grabbed him by the arm, twisted his arm, "drug him" back inside the school and refused to allow him to leave with his stepmother; during William's weeks of custody, Lindsay searches his book bag after school and removes some of his papers; at times, Lindsay takes his homework papers to the library and takes pictures of them; he was embarrassed because other children have witnessed Lindsay's actions; Lindsay followed him, William and William's wife to a rodeo event and "followed them around"; he was anxious and nervous because he always feared that Lindsay was going to "record" him; Lindsay told him that William "took drugs" and had been to jail; Lindsay told him that she had called the police department on William because "she didn't feel safe anymore and that she saw a bunch of drugs in the fridge"; Lindsay and Greg Bell "recorded him a lot"; he was concerned that Lindsay was going to take him back to Pennsylvania and he would not have an opportunity to spend time with William; he is reluctant to share information/plans with Lindsay; he does not like the fact that Lindsay sends various people to pick him up from school because of her after-school coaching duties; and he is not interested in some of the activities Lindsay wants him to try, but she "never listens to [me] anyway."
On September 6, 2016, William filed another rule nisi, requesting that he be awarded primary domiciliary custody and that Lindsay be allowed visitation every other weekend per Davis' recommendation. William sought an interim custody order, in addition to a court order prohibiting Lindsay from the following actions: contacting Quincy's school; "physically going on the premises" of the school "for any purpose"; and enrolling or registering Quincy in any extracurricular or educational activities or tutoring programs. Further, William sought an order declaring that he, his wife and his parents "shall exclusively provide or arrange for the transportation of [Quincy] to and from the campus" of his school.[12]
*118 In response, Lindsay filed exceptions of prematurity and no cause of action, arguing that William had not shown any immediate or irreparable injury to Quincy, and was not entitled to an interim custody order. She also argued that William was attempting to circumvent a trial on the merits by obtaining an interim order based solely upon the report of Sandi Davis. Further, she denied the allegation that she would be unable to transport Quincy to and from school, asserting that her schedule had become more flexible. Lindsay also filed a reconventional demand, alleging, inter alia , that Michael Gonyea, William's friend and frequent visitor, had been arrested for multiple counts of possession of child pornography. She sought an order prohibiting Gonyea from having any contact with Quincy. Further, Lindsay requested that all previously agreed-upon injunctions between Quincy "and certain individuals" be vacated.
A hearing was conducted on September 22, 2016, during which Sandi Davis, Kim Slack and Laura Way (Lindsay's sister) testified. Following the hearing, the trial court issued an interim order granting William's request for domiciliary custody. Lindsay was awarded visitation every other weekend and for three additional hours during the week immediately following her weekend of visitation.[13] However, before the judgment was reduced to writing, on September 23, 2016, Sandi Davis sent an "urgent" message to the trial court and the attorneys for the parties:
I need to speak to you about some very disturbing things that I've discovered on social media as it relates to the overall well-being of Quincy Lucky. I knew it wouldn't take long for the drama to happen, but I am most concerned because the exchange is scheduled to take place at 3:00 pm today. Based on this information, the Court may need to intervene. This is very serious to me and I don't take what I've read lightly at all.
* * *
Davis attached various photographs and social media exchanges between Greg Bell, Jill Way and others. The social media postings attached to Sandi Davis' memorandum were as follows:
[JILL WAY] -Things will be big and soon! WE WILL NEED ALL OF YOUR HELP!! We have to save Quincy from his Satan family here on earth
* * *
[GREG BELL] -Some numbers to digest ... when Quincy gets done with "school" this year he will be the most "Ordered by Judgement [sic] Truant Child" in the United States at 136 days of school missed!
[JILL WAY] -I predict he will be enrolled in a school in the next few weeks as soon as he is done playmate [sic] gets bored!
Other messages contained the following hashtags: "weneedyourhelp" and "stopcorruption."
*119 Additionally, Davis forwarded a report that Shelley Booker had prepared on June 28, 2016, in which Booker expressed concerns that Greg Bell had researched her personal social media accounts.[14] Following a telephone conference with the attorneys for both parties, the court, on its own motion, ordered the suspension of Lindsay's visitation and granted supervised visitation to her "for two one[-]hour periods per week at her expense until further orders of this Court."[15]
On October 10, 2016, William filed a supplemental and amending rule, seeking the "sole care, custody and control" of Quincy, "subject to whatever visitation the Court deems to be appropriate considering the disturbing conduct of Lindsay D. Way and the recommendations of Ms. Sandi Davis and Ms. Shelley Booker with respect thereto."
On October 13, 2016, Lindsay filed a motion to "vacate, set aside or remove" the trial court's order with regard to supervised visitation. In the pleading, Lindsay alleged that she was unaware that Bell and her mother had made the social media postings and she had previously agreed to, and abided by, the "no contact" orders against Bell and her mother. Further, Lindsay argued that the social media postings did not constitute "clear and convincing evidence of a threat to warrant any revocation of visitation[.]"
On that same date, Davis wrote to the trial court and counsel for both parties, in which she addressed Lindsay's filing. Davis explained that she decided to bring the social media comments to the attention of the trial court because Lindsay's family lives in Pennsylvania, and she believed that "they might try to abscond with [Quincy] and enroll him in school in Pennsylvania."[16] Davis further wrote:
After [the trial judge] read the fax, I explained to him my concerns about the content of these posts and how seriously I interpreted the underlying meaning. "We have to save Quincy from his Satan family here on earth." Well I took this to mean what it said, which means if they have to save Quincy , they have to remove him from the Satan family here on earth . And then to engage every one's help in this matter. My main priority was to alert the Court of my concern about these posts and to seek the Court's advise [sic] as how to proceed.
* * *
I am in no way over dramatizing these concerns, as I have consulted with Shelley Booker, LCSW * * * who expressed similar concerns.
*120 * * *
On October 19, 2016, the trial court signed a judgment in which William was designated interim domiciliary parent and was given "sole authority to make all decisions affecting Quincy * * * including, but not limited to * * * any medical and dental care issues, any issues surrounding the educational development of Quincy, including Quincy's education at A Kid's Choice Foundation, and any matters of religion and spiritual guidance of Quincy." Lindsay was granted visitation every other weekend and for three hours every other Tuesday "until further orders of this Court[.]" Further, the judgment prohibited Lindsay from contacting any employee of Quincy's school and from going on the premises of the school "for any purpose whatsoever." Additionally, both parents were prohibited from enrolling Quincy in any additional educational or tutorial activities. Moreover, the trial court granted Lindsay's motion to prohibit William from exposing Quincy to Michael "Brandon" Gonyea and denied her motion to vacate the prior "no contact" orders regarding Jill Way, Greg Bell and John Anthony Fertitta.
On December 16, 2016, William filed a supplemental rule, seeking sole custody of Quincy and limiting Lindsay to supervised visitation "subject to and conditioned upon [Lindsay] securing some form of psychiatric treatment and/or therapy." He alleged the following: after the trial held on September 22, 2016, "members of LINDSAY D. WAY's crew commenced posting negative, derogatory, hateful, slanderous and malicious statements on social media sites"; Lindsay's vehicle was registered in Pennsylvania, the state to which she "originally absconded with" Quincy; Lindsay was mentally ill; and Lindsay was engaged in "voodoo or other occult practices." William also made the following specific allegations:
* * *
17.
* * *
(A) LINDSAY D. WAY suffers from and is afflicted by some form of serious mental illness;
(B) WILLIAM ARTMER LUCKY, IV is scared to death that IF [Lindsay] ever gets access to this child free and clear of supervised visitation, there is no telling what [Lindsay] and her crew of defiant supporters and sociopaths will do to or with this child, including, but not limited to, abducting this child and absconding from the State of Louisiana or even worse; and,
(C) LINDSAY D. WAY obviously needs some significant psychiatric treatment.
* * *
Additionally, William sought a permanent injunction to prohibit Lindsay, "her agents, accomplices and anyone acting on her behalf * * * from exposing [Quincy] * * * to participate as a member in any form of spiritual practice not specifically approved by [William]; this prohibition should include any form of occult group, any form of voodoo, witchcraft or satanic worship, any paranormal practices and/or any other form of comparable antisocial behavior." Attached to the petition was a photograph of Lindsay wearing a hula hoop, to which she had attached rubber chickens. In the background of the photograph was a prayer that Lindsay had written on large slate tablets. In response, Lindsay denied being involved in any "occult practices" or "voodoo." She explained that the hula hoop was a target game she made for Quincy and the students in her physical education classes. She also averred that the picture was taken in her living room, and the location of the prayer/slate *121 tablets in the background of the photograph was coincidental.
Subsequently, on December 22, 2016, William filed another rule, seeking an order to prohibit Lindsay from exposing Quincy to Laura Way, Lindsay's sister, "in any manner whatsoever[.]" William alleged that Laura Way had "verbalized a threat to kill" him and that she posed "an extremely real and present danger" to Quincy.[17] Further, William sought an injunction prohibiting Lindsay from notifying and/or inviting Laura Way to attend any events in which Quincy would be involved and from allowing Laura to come to Lindsay's home when Quincy would be there. On December 27, 2016, William filed a supplemental rule seeking an injunction barring any and all contact between Laura Way and Quincy. The trial court signed the order granting the injunction on January 4, 2017.
A trial was conducted on multiple days in January 2017, at which numerous witnesses, including William and Lindsay, testified. William testified as follows: he has two other children; his oldest child, a daughter, is an adult; he had custody of the daughter until she became an adult, with the mother having supervised visitation; he has a son who lives in Tennessee and he has "no involvement" with that child; he is Baptist and Lindsay is Jewish; he does not want Quincy "raised Jewish"; he would be opposed to Quincy attending a Catholic school or Catholic church "because we're Baptist" and he wants Quincy to be "raised Baptist"; initially, he attended Quincy's activities at First Baptist, including sporting events; over time, he stopped allowing Quincy to participate in events at First Baptist, including sports and awards ceremonies, during his week of custody; and he did so "for obvious reasons."
Lindsay testified as follows: she and William both love Quincy; she believes that both of them should be involved in Quincy's life; she has never had any intention of abducting Quincy; when she moved to Pennsylvania in 2008, she was seeking relocation and she was not absconding with Quincy; she returned to Louisiana because she did not want her location to affect her custody of Quincy; she has never discussed kidnapping Quincy with anyone; she and Bell made recordings of Quincy; she "definitely regret[s]" making the recordings; she has abided by the "no contact" order between Bell and Quincy; Bell has never physically harmed Quincy and she would never allow him to do so; she has never used corporal punishment with Quincy; she does not have any social-media accounts; she was not involved in the social-media postings by her mother and Greg Bell; she has never participated in "any kind of voodoo worship or sacrificing"; her mother is Jewish and her grandmother *122 is Protestant and her family practiced aspects of both religions during her childhood; she did not attend synagogue as a child; she converted to Catholicism in 2012 when she was teaching at a Catholic school; she attends a Catholic church; she does not have any dislike or prejudice against the Baptist religion; she used the hula hoop/rubber chicken apparatus for instructional games at school; she never used it for any type of "religious activity" at the school; she placed the slates with the prayer near the fireplace in her home because the slates are heavy and she was unable to hang them on her wall; and by the time she took the photograph with the hula hoop/rubber chickens, the slates had been in the location by her fireplace "for months."
At the conclusion of the hearing, the trial court granted William "sole care, custody, and control" of Quincy and ordered supervised visitation for Lindsay "for up to four (4) hours per week." The order further provided that the court would not review Lindsay's order of supervised visitation "unless and until [Lindsay] has sought and obtained an evaluation from a psychiatrist who has had the benefit of the professional opinions and testimony of Ms. Sandi Davis ... and Ms. Shelley Booker, [and] [Lindsay] has sought and obtained sufficient psychiatric therapy and treatment such that she does not present a continuing danger to the mental and/or physical health of Quincy." In its rather lengthy oral reasons for judgment, the trial court stated, in pertinent part:
* * *
There was an attempt made to discredit or show some sort of a bias or prejudice on the part of Ms. Davis. I did not find, as a trier of fact, any credible evidence that would lead me to believe that either Ms. Davis or Ms. Booker were prejudiced, were biased or let that reflect in their valuable assistance that they gave to this Court. * * * I can assure you those mental health professionals stood ready to accept and help and assist in getting to the root problems, forming solutions and helping Quincy. * * * I found no basis for finding that they were in any way prejudiced or biased.
* * *
I'm not looking at Buddy Lucky and saying he's a perfect father. He had some issues. [The] mental health professionals called him out on [those issues]. He had attempted to remedy those and be more receptive to what was being said. I think I can just basically summarize it by saying, based on the observation of the Court based upon his testimony, I found Mr. Buddy Lucky to be a credible witness. I found him to express himself in a situation that, no doubt, I think the word's been batted about, "frustration." It's a ... high factor in this case. * * * I do believe he is giving it his best effort.
* * *
[The] individuals that testified, either colleagues of Ms. Way from First Baptist or parents of children at First Baptist, I found to be extremely intelligent; I found to be well meaning; I found them to be-um-truthful as far as the information they had would allow them to express any opinion to the Court that may be of importance. * * * They really only have, as do the others, they have an appreciation for Ms. Way as to her abilities as a PE teacher, her abilities as a coach, which her win record is very impressive. And she is well respected in those areas. As a parent, the interaction that Ms. Way has with them is-is good to the point that they would defend her and want to be on her side. But my knowledge of the situation and the process of ... the mental health professional's *123 evaluation does not match in what they said had occurred. Maybe that was their perception. It was discounted by the Court.
* * *
Ms. Way, I'm going to be very direct. You have not been compliant. * * * I'm somewhat concerned about judgment. And that judgment moves-stems not only from what I heard on those tapes,[18] which this Court-I-I try to be fair. I try to hear it for myself. And those tapes as this child was questioned by you and Mr. Bell and a lot of talk about parental alienation-if-that-that was painful for me to listen to. And I don't think you realized what you were doing to that child. I think you believed you were helping your position, but I can assure you I didn't hear any mental health professional support that. * * * It bothered me greatly. I listened as we moved through these things. I watched and observed everyone here. I was, quite frankly, glad when there was a motion to have a psychiatric evaluation. Unfortunately, we all are aware that Mr. Williams died during the course of this and prior to him giving me a final report.
* * *
I've got situations where you've placed yourself and allowed persons with, in this lay person's opinion, persons with narcissistic personality traits [.][19]
* * *
When we talk about toxicity and negativity, I believe there has been a campaign to undermine [William] at First Baptist School. [I] can tell from the answers that were given on this stand.[20]
* * *
[W]hat I'm appreciating here is that it is the Court's opinion that Ms. Way has done more to emotionally harm her child than I think she appreciates.[21]
* * *
Now, I'm not putting a halo on Mr. Lucky's head. I think he's done a fine *124 job in attempting to do what he believes is best for his child under some difficult circumstances. And he's caused some of the frustration. But all-in-all, I find him to be a good, acceptable parent who makes the recognition that it, in fact, does take a village to raise a child.
* * *
And Ms. Way, I'm at a loss to explain your lack of judgment to the people you subjected the child to, to the-the extent you have gone to justify your positions, and I just, basically, stand amazed that I find myself in this situation because of the fact that it is just an inability to launch and put Quincy present. * * * You, perhaps, are wanting to be the best parent you can be, but it has caused some damage along the way. I take-I have great respect for the thought that Quincy may need some counseling in this situation. And I hope that does occur if factors exhibit themselves where he acts out.
* * *
Now, I'm well aware that the Court has to find-the Court has to find clear and convincing evidence that the maintenance of a current custody decree is so detrimental to the child's wellbeing that any harm caused by the change would be substantially outweighed by the advantage of this change to the child. Clear and convincing. * * * I am almost to the point of saying that I am convinced beyond a reasonable doubt. I know that's a criminal standard, but I'm giving you that standard so you understand my degree of confidence in this decision. And therefore, this Court will award sole custody to Buddy Lucky.
* * *
[I]n this case based upon what the Court heard and what this Court reviewed, I'm convinced that there seemed to be an attempt to alienate Mr. Lucky from his child and why not-and while not physical abuse what that child was subjected was no less than emotional abuse. And for that reason, I'm placing supervised visitation on Ms. [Way].
* * *
Kids aren't meant to be in the mix of [litigation] for this length of time. It's detrimental to him. I've already found that. And so what I'm telling you is that he needs stability and structure. And, quite frankly, the Court's convinced that through this period, although it's been a delay and increased length of time this litigation has gone on, I'm satisfied that the structure and stability that's provided by Mr. Lucky is in this child's best interest.
* * *
Lindsay now appeals.
DISCUSSION
Lindsay contends the trial court erred in modifying a considered decree of joint/shared custody and awarding William sole custody of Quincy. She argues that because William sought a change in a considered decree of child custody, the trial court was required to adhere to the factors set forth in Bergeron v. Bergeron , 492 So.2d 1193 (La. 1986) in its determination of the issue. Further, Lindsay argues that a de novo review of the record is warranted by this Court because the trial court illegally "modified an existing custody decree" by issuing the September 2016 interim order without conducting a trial on the merits.
It is a well-settled principle of law that the paramount consideration in any determination of child custody is the best interest of the child. La. C.C. art. 131 ; Evans v. Lungrin , 97-0541 (La. 2/6/98), 708 So.2d 731 ; Wilson v. Finley , 49,304 (La. App. 2 Cir. 6/25/14), 146 So.3d 282 ; Semmes v. Semmes , 45,006 (La. App. 2 Cir. 12/16/09), 27 So.3d 1024. The court is to consider all *125 relevant factors in determining the best interest of the child. La. C.C. art. 134.[22]
The trial court is not bound to make a mechanical evaluation of all of the statutory factors listed in La. C.C. art. 134, but should decide each case on its own facts in light of those factors. Wilson , supra ; Semmes , supra ; Robert v. Robert , 44,528 (La. App. 2 Cir. 8/19/09), 17 So.3d 1050, writ denied , 2009-2036 (La. 10/7/09), 19 So.3d 1. These factors are not exclusive, but are provided as a guide to the court, and the relative weight given to each factor is left to the discretion of the trial court. Id.
The trial court has vast discretion in deciding matters of child custody and visitation. Semmes , supra ; Wilson , supra . Therefore, the trial court's determination will not be disturbed on appeal, absent a clear showing of an abuse of discretion. Bergeron v. Bergeron , supra ; Semmes , supra ; Wilson , supra . As long as the trial court's factual findings are reasonable in light of the record when viewed in its entirety, the appellate court may not reverse, even though convinced it would have weighed the evidence differently if acting as the trier of fact. Id.
A considered decree is an award of permanent custody made when the trial court has received evidence of parental fitness. Lawrence v. Lawrence , 50,799 (La. App. 2 Cir. 5/25/16), 197 So.3d 198, writ denied , 2016-1368 (La. 9/6/16), 205 So.3d 918 ; Bagwell v. Bagwell , 48,913 (La. App. 2 Cir. 1/15/14), 132 So.3d 426, writ denied , 2014-0356 (La. 3/14/14), 135 So.3d 608. In an action to change a custody decision rendered in a considered decree, consideration of the child's best interest is made, but also an additional jurisprudential requirement is imposed. In such actions, the proponent of the change bears a heavy burden of proving that a change of circumstances has occurred, such that the continuation of the present custody arrangement is so deleterious to the child as to justify a modification of the custody decree, or that the harm likely caused by a change of environment is substantially outweighed by its advantages to the child. Bergeron , supra ; Lawrence , supra .
In Long v. Long , 28,763 (La. App. 2 Cir. 12/11/96), 684 So.2d 1099, writ denied , *126 97-0096 (La. 3/7/97), 690 So.2d 20, after the child custody case began, the trial court allowed a recess to enable the parties an opportunity to negotiate a custody arrangement. Thereafter, the parties signed joint stipulations regarding the child custody schedule. Subsequently, the trial court signed the stipulation, which contained the statement that "[t]hese stipulations and resulting judgment have occurred after evidence has been produced, and * * * that any future modification of the judgment * * * shall be held to the standard of proof articulated in the Louisiana Supreme Court case of Bergeron [.]" This Court affirmed the trial court's finding that the agreement was a considered decree, stating:
In the instant case, efforts at mediation failed; a trial started and recessed and, over a two week period, protracted discussions were conducted, resulting in a detailed custody sharing plan that provided for all of the usual holidays. The entire process was contentious. Under these circumstances, we consider the 1992 judgment adopting the joint stipulations to be a considered decree and therefore subject to the Bergeron burden of proof.
Id. at 1101.
In Cherry v. Cherry , 2004-0002 (La. App. 4 Cir. 2/2/05), 894 So.2d 1208, after several days of testimony, the parties reached a custody agreement. The agreement, which was reduced to writing and signed by the trial court, awarded sole custody of the children to the father. The agreement specified, "[T]he court finding that sole custody in favor of [the father] clearly and convincingly to be in the best interest of the children, considering all pertinent facts and circumstances." The court of appeal affirmed the ruling, stating:
This was not the typical consent judgment presented to the judge for his signature by the parties without a hearing. The record reflects that this judgment was only agreed to by the parties after three days of hearings during the course of which sufficient evidence was entered into the record to substantiate the Bergeron factors. Accordingly, we find no error in the trial court's judgment * * * holding that the * * * custody order was a "considered judgment."
Id. at 1213.
As in Cherry , supra , the May 2010 judgment in this case was not the typical consent judgment. A trial was conducted on May 11, 12, and 14, 2010, during which witnesses testified and evidence was introduced. The court rendered judgment on May 14, 2010, awarding joint custody to the parties. However, before the judgment was signed, Lindsay returned with the child to Louisiana. William then filed a motion requesting a new trial and that he be awarded sole custody. Thereafter, William and Lindsay entered into a joint custody implementation plan, whereby they agreed to alternate physical custody of Quincy on a weekly basis.[23] Additionally, *127 pursuant to the joint custody implementation order, William and Lindsay were designated "co-domiciliary" parents, with each parent enjoying domiciliary custody during their respective custodial week. That custody order/joint custody implementation plan remained in effect until 2015, when William filed a rule seeking sole domiciliary custody. In response, Lindsay filed a reconventional demand, seeking sole custody, and in the alternative, to be designated sole domiciliary parent.
Based upon our review of this record, we cannot unequivocally say that the May 2010 judgment, after a three-day trial, was a "considered decree." However, we find that such a determination is unnecessary under the facts and circumstances of this case. The evidence of record shows that the trial court made a "beyond a reasonable doubt" finding that joint custody was no longer feasible or in the best interest of the minor child. Therefore, even if it was necessary, the heavy burden of proof has been met in this case because this record demonstrates that the continuation of the joint custody is so deleterious to the child as to justify a modification of the custody decree. Consequently, we agree with the trial court's finding that the parties' original custody arrangement was no longer feasible, as their circumstances changed when their relationship deteriorated to the point that they could no longer co-parent their child.
We are mindful that the paramount goal in child custody cases is to reach a determination which serves the best interest of the child . The record reveals Quincy suffers from a severe form of dyslexia and ADHD. He is nearly 10 years old and has not lived in a stable environment for much of his life. The record also reveals that the actions of both parents show that neither parent has been willing and/or able to facilitate and encourage a close and continuing relationship between Quincy and the other parent.
The report issued by Sandi Davis indicates that Quincy has lived two very different lives, depending upon which parent exercised domiciliary custody. For example, Lindsay, a physical education teacher and coach, enrolled him in various sporting activities and dressed him in athletic attire. Conversely, William, whose family owns a farm, enrolled Quincy in rodeo-related activities and dressed him in jeans and boots.
As stated above, it is abundantly clear from this record that these parents have not been able to co-parent Quincy, who has been somewhat "lost in the shuffle" due to their efforts to "win" custody. Both parents have expended a vast amount of energy obstructing the relationship between the child and the other parent. Both parties, although they attempted to justify their actions, made it almost impossible, or inconvenient at least, for Quincy to speak to the other parent during their period of domiciliary custody. When Quincy was permitted to speak to the other parent, the speakerphone mode was employed by the other parent to hear his conversation.
Additionally, the record reveals that William refused to notify Lindsay when Quincy sustained serious injuries after being thrown from a horse.[24] Further, William has admittedly refused to allow Quincy to attend the sporting activities in which Lindsay had enrolled him. He has also adamantly refused to inform Lindsay of Quincy's rodeo activities so that she can *128 attend to support Quincy, explaining that Lindsay and/or her friends have caused trouble at Quincy's events. William's account of the behavior of Lindsay and her friends at various events was corroborated by Quincy's statements to Davis.
Further, Lindsay has gone to somewhat extreme lengths to "win." The record reveals that she has made disturbing derogatory comments about William to Quincy. She has also followed William and his current wife to events and has videotaped their activities. Lindsay also neglected to notify William of an occasion when Quincy had to undergo anesthesia for a dental procedure. Additionally, Lindsay and her friend, Greg Bell, made several recordings in which they asked Quincy leading (and rather probing) questions, in an attempt to garner specific answers from him.[25]
Sadly, it has been demonstrated that every single issue, both large and small, has been contested by one party or the other in this case. Thus, the severity of the lack of communication and cooperation on the part of both parties proves that the continuation of the joint/shared custody arrangement is no longer feasible.
Nevertheless, a review of the record reveals that, despite their animosity toward each other, both William and Lindsay have the capacity to provide Quincy with love, affection and spiritual guidance and to continue his education and rearing. Further, both William and Lindsay have been providing food, shelter, clothing and medical care for Quincy and have the ability to continue to do so.
When faced with the arduous task of determining which of these parents should be awarded custody of Quincy, the trial judge-who has been presiding over this protracted litigation for many years-was in the position to observe the demeanor of the many witnesses and review all of the evidence submitted in this voluminous record. The court determined that it was in Quincy's best interest to award sole custody to William.
The record reveals that William has a rather stable home environment. He has a large extended family who live locally and can assist in Quincy's care and upbringing. The trial court found that throughout the proceedings, William has made improvements *129 in his behavior and ceased his acts of animosity toward Lindsay.
On the other hand, the trial court found that Lindsay has few people in her local circle who have demonstrated an ability to assist her with Quincy's care and rearing. Additionally, some members of Lindsay's family and some of her friends have proven to be such a risk to Quincy's well-being that the trial court has signed orders barring Lindsay from allowing Quincy to be in their presence. Further, Quincy's current unconventional school schedule is such that he does not have school on certain days, and on other days, he gets out of school long before Lindsay does. The court concluded that Lindsay has demonstrated that she has difficulty arranging transportation and child care for Quincy when she has physical custody of him. The trial court also concluded that throughout the proceedings, Lindsay has been somewhat defiant and uncooperative, and she has ignored orders from the court.
Furthermore, the trial court noted that Quincy's account of Lindsay's conduct/behavior is most telling. As stated above, Quincy has expressed that he would rather live with William most of the time. He also stated that he does not feel safe in Lindsay's home and that she instigates verbal confrontations at his events. Additionally, Quincy provided a disturbing account of Lindsay's inappropriate comments to him regarding William's past drug use and William's desire to "kill me before I was born." Quincy described his mother as someone who "lies all the time" and stated that she "never listens" to him. Consequently, we find that the trial court did not abuse its vast discretion in finding that it is in Quincy's best interest to award sole custody to William.
Lindsay also contends the trial court erred in awarding her supervised visitation. She argues that she is entitled to reasonable visitation rights, absent "conclusive evidence" that unsupervised visitation would seriously endanger Quincy's physical, mental, moral or emotional health.
The best interest of the child is the sole criterion for determining a noncustodial parent's right to visitation. Cooper v. Cooper , 43,244 (La. App. 2 Cir. 3/12/08), 978 So.2d 1156 ; Hoskins v. Hoskins , 36,031 (La. App. 2 Cir. 4/5/02), 814 So.2d 773. The trial court has the inherent power to determine a child's best interest and to tailor custody orders, including visitation, in a manner that minimizes risk of harm to the child. Cooper , supra ; Gaskin v. Henry , 36,714 (La. App. 2 Cir. 10/23/02), 830 So.2d 471.
As noted above, the trial court found, and the record demonstrates, that Lindsay made multiple questionable decisions and missteps throughout these proceedings. Namely, she has made disturbing comments about William in Quincy's presence; she has staunchly defied court orders; she has refused to answer questions during depositions; she and her friend made audio recordings in which they questioned Quincy about various topics; and she has followed William and his wife, attempting to make video recordings of them.
Moreover, members of her close family/friendship circle have engaged in conduct that is alarming and is potentially deleterious to Quincy. For example: Lindsay's mother has a history of prescription drug abuse; Lindsay's sister, who suffers from a psychological issue, has expressed a desire to kill William and herself; Lindsay's friend, who was also Quincy's baseball coach, was in possession of illegal drugs and a firearm at the time of his arrest for driving while intoxicated; Quincy reported that Lindsay's close friend, Greg Bell, had hit him; and Lindsay *130 admitted that Bell instigated and spearheaded the multiple audio recordings/interrogations of Quincy.
The totality of the evidence presented convinced the trial court of the need to protect Quincy from Lindsay, via supervised visitation, until the court is persuaded that Lindsay has demonstrated her psychiatric/mental fitness. Although supervised visitation is harsh and restrictive, we are mindful of the paramount goal in child custody cases: the best interest of the child. Consequently, we find that the trial court did not abuse its discretion in awarding supervised visitation to Lindsay.
Lindsay further contends the trial court erred in relying solely upon the opinion of Davis when making its determination regarding custody and visitation. She argues as follows: Davis was "biased, operated under a conflict of interest, and improperly performed the duties of a court-appointed evaluator"; the trial court was required to scrutinize Davis' opinions pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc. , 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed. 2d 469 (1993), and State v. Foret , 628 So. 2d 1116, 1123 (La. 1993) ; the appointment of Davis violated the law because she had previously served as parenting coordinator in this case; and Davis and Booker impermissibly consulted with each other throughout these proceedings.
La. R.S. 9:331 provides:
A. The court may order an evaluation of a party or the child in a custody or visitation proceeding for good cause shown. The evaluation shall be made by a mental health professional selected by the parties or by the court. The court may render judgment for costs of the evaluation, or any part thereof, against any party or parties, as it may consider equitable.
B. The court may order a party or the child to submit to and cooperate in the evaluation, testing, or interview by the mental health professional. The mental health professional shall provide the court and the parties with a written report. The mental health professional shall serve as the witness of the court, subject to cross-examination by a party.
After weighing and evaluating expert and lay testimony, the trial court may accept or reject the opinion expressed by any expert. It is within the trial court's discretion to substitute its common sense and judgment when such a substitution appears to be warranted by the record as a whole. Tuft v. Tuft , 51,293 (La. App. 2 Cir. 1/18/17), 214 So.3d 916 ; Manno v. Manno , 49,533 (La. App. 2 Cir. 11/19/14), 154 So.3d 655.
In this case, it was Lindsay who initially requested the appointment of a mental health professional to evaluate William's mental fitness. Thereafter, both parties, including Lindsay, stipulated to the appointment of Davis as mental health evaluator. Further, the record aptly demonstrates that "good cause" existed to appoint a mental health evaluator, as the parties were unable to agree on important issues regarding the parenting of Quincy. Although Lindsay clearly disagreed with the observations and recommendations of Davis, it is clear that the expert's evaluation was of great benefit to the trial court. We do not find that the trial court erred in relying on Davis' report, even in light of Lindsay's objections to her findings.
Although the trial court relied, in part, on the recommendations of Davis, it is evident that the court also focused on Lindsay's behavior and actions. There is no provision in our law that provides that Davis and Booker (serving as mental *131 health evaluator and parenting coordinator in this case) were prohibited from communicating with each other and combining their efforts in this child custody matter. Therefore, we find no error in the trial court's appointment of Davis as mental health coordinator or in the denial of Lindsay's Daubert motion in this matter. This assignment lacks merit.
CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to the appellant, Lindsay Diane Way.
AFFIRMED.

In some portions of the record, William Lucky is referred to as "Buddy" Lucky. Throughout this opinion, we will refer to him as "William."

Lindsay alleged as follows: she left the home she shared with William because she became "fearful of her life and safety" after William struck her "in the back of the head with an unknown object"; William had a "long history of substance abuse," "deep rooted anger problems," "serious mental health issues"; and William had been "unable to maintain full time employment." Lindsay requested an order requiring William to submit to random drug screens and to attend and complete an anger management class. Lindsay did not pursue her allegations of abuse.

Lindsay returned with Quincy to Louisiana for visitation in January and February 2009. During these visits, William accused Lindsay of using breastfeeding as a means to "impair" his time with Quincy.

During this time, Lindsay changed attorneys multiple times.

The filings most significant to this litigation are as follows:
In September 2010, William filed a rule seeking to prevent Lindsay from leaving Quincy in the care of her mother, Jill Way, due to Jill's alleged "extensive and continuous use of illegal drugs." A stipulated judgment was entered, whereby Lindsay agreed that Quincy would not be left alone with Jill Way "for a period of more than thirty (30) minutes" and that Quincy would not be a passenger in a vehicle being driven by Jill Way. Later in the proceedings, on September 26, 2016, William obtained a court order enjoining Lindsay from "exposing [Quincy] to Jill Way in any manner whatsoever ..., accordingly, [Quincy] shall not be exposed to, not have any contact with or otherwise not communicate with Jill Way in any manner whatsoever."
In the summer of 2011, Lindsay claimed that William had violated the custody order by keeping Quincy from her. On January 12, 2012, she filed a rule to modify the custody plan. On April 9, 2012, the trial court signed a judgment modifying the custody order with regard to school holidays and summer months.

William made the following allegations:
* * *
4.
The designation of Ms. Way as domiciliary parent of Quincy during her custodial periods has caused problems for Quincy. Those problems include, but are not limited to, Ms. Way's planning activities, basically sports participation, for Quincy that interfere with Quincy's schoolwork and education and Quincy's ability to have a consistent schedule in both parents' households. Further, these issues have been compounded by Ms. Way's becoming employed at Quincy's school. Ms. Way's attention is focused on Quincy's participation in sports and other extracurricular activities and not upon his academic education. For example, Ms. Way enrolls Quincy in as many as four sports activities at one time requiring practice or games every day and with her coaching or acting as assistant coach. Quincy is affected by dyslexia, and he needs extra attention to [sic] his education as a priority to participation in sports and other extracurricular activities.
5.
* * *Mr. Lucky is attempting to find alternatives to boost Quincy's academic performance so that he can catch up with his peers. Such an alternative may include home schooling and schooling with private teachers and tutors. Ms. Way will not be supportive of these options because of her focus on Quincy's participation in sports which she coaches and other extracurricular activities and her desire to have Quincy continue in attendance at the school at which she is now teaching.
6.
The consequence of the difference in Mr. Lucky's emphasis on Quincy's education and Ms. Way's emphasis on Quincy's participation in sports which she coaches is that Ms. Way's functioning as a "co-domiciliary" parent of Quincy has become detrimental to him. All of this constitutes a material change in circumstances rendering a change in the terms of the existing judgments and joint custody plan necessary to address Quincy's education and academic performance. It will be detrimental to Quincy for a change not to be made and for matters to continue as currently established.
7.
In addition, Ms. Way communicates inappropriately with Quincy. For example, Ms. Way tells Quincy that Mr. Lucky is trying to take Quincy away from her and that she cries when he is not with her. This causes Quincy to feel badly and to feel responsible for his mother's well being [sic]. Ms. Way communicates to Quincy that Mr. Lucky took his older sister from her mother. None of this is appropriate for a child to hear. [Note: the record reveals that William has a daughter who is now an adult. When the daughter was younger, William obtained sole custody of her. The mother of the child was awarded supervised visitation].
* * *

According to Lindsay, William did not attempt to assist Quincy with homework and other school assignments during his week of custody. She also alleged that some of Quincy's homework assignments were completed in William's then-fiancée's handwriting.

The record reveals that William was vehemently opposed to Lindsay being hired as a teacher at First Baptist. Dr. William James Gillespie, the "Head of School" at First Baptist, testified that William approached him and told him "not to ever consider hiring" Lindsay because "she's not a person I would want on my staff." He complied with William's request when Lindsay applied for a teaching position at the school in 2010. Dr. Gillespie also testified that when he hired Lindsay in 2014, William questioned him about his decision and threatened to withdraw Quincy and other children in his family from the school. He maintained that he hired Lindsay because she had a strong reference from her previous employer.
William admitted that he did not want Lindsay teaching at the school where Quincy was enrolled. He also admitted that he told Dr. Gillespie that if he hired Lindsay, he was "pulling my kids out of here and-and the Hamms are pulling their kids out of here."

William sought and obtained an order prohibiting Lindsay from exposing Quincy to Gregory Cooper Bell (who had allegedly administered corporal punishment to Quincy) and Anthony Fertitta (Quincy's former baseball coach who had been arrested and charged with "operating a vehicle under the influence of alcohol and drugs"). William also alleged that at the time of his arrest, Fertitta was in the possession of illegal drugs and a firearm.

The pleading did not contain any specific allegations. Nevertheless, William alleged that he had "significant concerns regarding the mental health and fitness of [Lindsay] as it relates to her ability to properly parent [Quincy]." He also alleged that a mental health examination was necessary to "ascertain the status of her mental health and specifically whether or not [Lindsay] is afflicted with some form of mental illness that will have a negative impact on her ability to effectively parent [Quincy]."
Lindsay objected to the demand for a psychiatric examination, arguing that William failed "to provide specific details (rather than the vague allegations) which amount to good cause to have [her] subjected to further mental health evaluations" in addition to the evaluations conducted by Sandi Davis. Further, Lindsay objected to the appointment of Dr. Williams on the basis that he was the brother of one of the members of William's counsel's law firm.
The trial court ordered Lindsay to submit to an "independent psychiatric examination" by Dr. Richard Williams. On the record, the trial court noted that Dr. Williams was not appointed by the court, but had been "hired by Mr. Lucky and allowed to perform an 'independent psychiatric examination' * * * pursuant to a discovery motion[.]" Dr. Williams conducted Lindsay's psychiatric evaluation; however, he died before submitting a final report to the trial court.

The record indicates that Quincy has a severe form of dyslexia and his academic performance at First Baptist had declined. Lindsay blamed William for the decline in Quincy's academic performance, maintaining that William refused to assist Quincy with homework. She also implied that William coerced Quincy to underperform in school because William no longer wanted him to attend First Baptist.

In her report, Davis documented her concerns about Lindsay's attitude toward the director and teachers at Quincy's school. According to Davis, the school's staff had reported that Lindsay insinuated that A Kid's Choice was "not a real school." The staff was concerned that Lindsay would not support Quincy's academic endeavors. Further, due to the school's nontraditional school hours, Lindsay had difficulty arranging transportation and childcare for Quincy.

The judgment also (1) prohibited Lindsay "and/or any agents" acting on her behalf "from physically going on the premises of A Kid's Choice Foundation for any purpose whatsoever until further orders of this Court"; (2) prohibited either party from enrolling Quincy in any additional educational activities until further orders from the court; and (3) prohibited and enjoined William from exposing Quincy to Michael Gonyea. Further, the court denied Lindsay's request to vacate the previously ordered injunctions with regard to Jill Way, Greg Bell and John Anthony Fertitta.

In the memorandum, Booker stated:
In my review of [Greg Bell's] deposition, I read information that was of great concern to me as the Parenting Coordinator, and I need to bring this concern to the court's attention to request assistance. To summarize, during his deposition, Mr. Bell made reference to researching/reviewing my personal social media sites and trying to determine who were my personal friends. I am unsure as to the involvement of Mr. Bell in my personal life, as he is not involved in the Parenting Coordination Process and will not be involved in the process-he is not biologically related to the child, he is not a step parent, he is not the boyfriend or live in companion to Ms. Way. * * *
* * *
* * *If I am going to continue in this role, it has to be with the understanding that my involvement is a professional role, and intrusions into my personal life/relationships will not continue[.]

The telephone conference was not recorded. Therefore, there is no record of the contents of the communication.

Davis stated that the social media comments had been emailed to her by William's wife.

During her testimony at the trial in this matter, Laura Way admitted that she made the comments regarding killing William. She testified as follows: she was angry because, due to the September court order, Quincy was unable to travel with Lindsay to Pennsylvania to attend the wedding of his maternal aunt; she was frustrated with the custody proceedings and she made the comments while "venting" to her friend; she repeated the comments to the principal of the school at which she worked; when the principal mentioned the PTA president later in the conversation, she "jokingly" commented, "I will just kill her, too"; she flippantly told her principal that she would "just kill myself too" because she did not want to go to jail; the principal referred her to the school's employee assistance program to undergo a psychological evaluation; and she was "cleared" to return to work after she underwent the evaluation.
According to Laura, she assumed that her friend knew she was "joking" when she made the comments. Further, Laura testified that she had worked with William throughout the proceedings and she has never threatened him.

The record reveals that Lindsay and Greg Bell made numerous recordings in which they repeatedly questioned Quincy about various topics. During the recordings, it is apparent that Lindsay and Bell were attempting to elicit certain responses from Quincy.

The trial court expressed its reservations about Quincy being left in the care of Lindsay's sister, Laura Way, because of the comments about killing William and committing suicide. The court also noted that Laura was "taking mood altering drugs for depression[.]" The court also expressed its reservations about Quincy being left in the care of "Mr. Bell," who "lashed out" in anger during his deposition.

The trial court recounted an incident where one of Lindsay's witnesses "interjected himself in these proceedings to the point that [the witness] called [Sandi Davis]." The court stated that the witness also appeared at the courthouse and attempted to "visit with court personnel" and caused a "disturbance, and afterwards, at some point in time * * * visited Ms. Davis' office." The trial court would not allow Ms. Davis to walk from the courthouse to her vehicle without an escort from the sheriff's department.

The trial court described incidents in which Quincy began to act out in school. The court also recounted an incident when Quincy told his teacher at First Baptist that Lindsay "beats him and socks him in the mouth and hits him in the face." His teacher reported the incident to the school's administration. The administrator did not report the allegations of abuse to the authorities, and despite Quincy's plea to the school to "call my dad," William was not notified. The trial court indicated its suspicion that the school did not investigate or report the allegations of abuse because Lindsay was an employee at the school. Nevertheless, the trial judge made it clear that he did not believe Quincy's reports of abuse, suggesting that Quincy's allegations could have been a "cry for help" due to "the emotional toll of these protracted proceedings."

La. C.C. art. 134 provides, in pertinent part:
The court shall consider all relevant factors in determining the best interest of the child. Such factors may include:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.

La. R.S. 9:335 provides, in pertinent part:
A. (1) In a proceeding in which joint custody is decreed, the court shall render a joint custody implementation order except for good cause shown.
(2)(a) The implementation order shall allocate the time periods during which each parent shall have physical custody of the child so that the child is assured of frequent and continuing contact with both parents.
(2) To the extent it is feasible and in the best interest of the child, physical custody of the children should be shared equally.
(3) The implementation order shall allocate the legal authority and responsibility of the parents.
* * *

Quincy's injuries included a broken arm and multiple lacerations that required stitches. He was kept in the hospital overnight. Lindsay was not notified until the following day. Surprisingly, William was the one who filed a pleading, complaining that Lindsay took Quincy to another physician after she learned of his injuries.

For instance, when questioning Quincy about William and his wife's wine drinking habit, Bell asked Quincy questions such as: what kind of wine do William and Jada drink? Is it red or white? What kind of store do they go to buy wine? Do they go to Wal-Mart? Does the store have candy and chips? Does the wine have a screw-on top? How do they open the wine? Quincy responded, "Which kind [of wine] is that bad kind?" In another recording, Lindsay questioned Quincy about possible events that took place after she ended a telephone conversation with him while he was in William's custody. She stated that she was "being bullied" (presumably by William) and told him that bullying was wrong and that he has to "stand up" for others when they are being bullied. Thereafter, she asked him did William say anything about her after the telephone conversation ended. In one recording Lindsay asked Quincy, "Did he [William] say anything about killing me again?" Additionally, Lindsay and Bell recorded a conversation with Quincy after he apparently announced that he no longer wanted to play baseball. On the recording, Quincy insisted that he enjoyed going to baseball practice but he did not like playing in games. Nevertheless, Bell and Lindsay questioned Quincy repeatedly about his like/dislike of baseball and seemed to imply that William had convinced Quincy that he did not like baseball. Further, Lindsay and Bell recorded a conversation about whether or not Quincy trusted Bell. On the recording, Bell could be heard reminding Quincy that Bell "does [Quincy's] toes better than anyone else." Lindsay could be heard reminding Quincy that Bell taught him how to swim and ride a bicycle. Lindsay and Bell also asked Quincy whether he had ever received a spanking. Quincy answered that William has spanked him and Lindsay had threatened to spank him in the past.